ATTACHMENT B

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| JAMES GARCIA,<br>                Plaintiff, | : | |
| | : | |
| vs. | : | No. 2:10-CV-00826-JAM-KJN |
| CITY OF SACRAMENTO, *et al.*,<br>                Defendants. | : | Report of Kenneth R. Wallentine |
| | : | |

The following report of Kenneth R. Wallentine is submitted after review of the following

documents, pleadings, records, and reports:

Plaintiffs' complaint

Defendants' initial disclosures

Sacramento Police Department Canine policy

Sacramento Police Department Use of Force policy

Sgt. Steve Oliviera deposition transcript

Sgt. Michael Hutchins deposition transcript

Det. Sgt. Lisa Hinz deposition transcript

Officer Gary Dahl deposition transcript

Lt. Dave Peletta deposition transcript

Lt. Dave Peletta second deposition transcript

*Garcia v. City of Sacramento et al.*
*Report of Kenneth R. Wallentine*          1

Officer Rosalia Cabrera deposition transcript

Officer Josh Frey deposition transcript

Officer Aaron Thompson deposition transcript

James Garcia III deposition transcript

Steven Brewer deposition transcript

Priscilla Pruitt deposition transcript

William Pruitt deposition transcript

Luis Robles deposition transcript

Michael Taylor deposition transcript

Investigator Blake Schnabel deposition transcript

Investigator Cory Shell deposition transcript

CHP Resport No. FT-454-209-09

Sacramento Police Department Report No. 09-107560

Sacramento Police Department Report No. 09-107600

Dispatch records pertaining to Sacramento Police Department Report No. 09-107560

Sacramento Superior Court Complaint No. 09F02824

Sgt. Steve Oliviera memorandum

Helicopter video recording

Various incident scene photographs & diagrams

Interview with Officer Gary Dahl

Officer Gary Dahl commendation and award file

Interview with Steve Brewer

Steve Brewer professional resume

Kenneth R. Wallentine states as follows:

1.      In the instant matter, I have relied upon the documents, diagrams, pleadings, records,

reports, and statements previously described.  I have formed a number of opinions based upon the

aforementioned, as well as my experience, education, and familiarity with professional

publications.  I have relied on a variety of professional publications, including, but not limited to,

my own publications and court decisions cited therein.  I have also relied on personal observations

of the training of Sacramento Police Department police service dog teams.  Those opinions, and a

summary of the circumstances known or reported to me upon which those opinions are based, are

set forth herein as follows:

a.      **Summary of reported information:**

On April 10, 2009, a pair of California Highway Patrol officers spotted a blue Honda Civic

with illegal taillights.  When the officers signaled the driver (later identified as Manuel Prasad)  to

stop, he stopped momentarily and then fled as soon as the two officers started to walk up to the

Honda Civic.  The officers gave chase.  After a brief pursuit, Prasad crashed the Honda Civic into

a wall and he fled on foot.  One of the officers followed on foot, later joined by the other officer.

They lost sight of Prasad.  The Highway Patrol officers called for additional help and broadcast a

description of Prasad as a male Hispanic, 5' 8", 140 pounds, wearing a gray shirt and blue pants.

Sacramento Police Department officers set up a perimeter for containment and a police

helicopter flew to the area to assist in the search for Prasad.  A Sacramento Police Department

police service dog team, Officer Gary Dahl and K9 Bandit, were sent to assist in the search.  A

Sacramento Police Department supervisor, Sergeant Lisa Hinz approved deploying the police canine. Standard warnings that a police service dog team was in the area and that residents should stay in their homes and lock their doors were broadcast from the police helicopter. Prasad was spotted at various locations within the perimeter; at one point he entered a shed.

Through the use of forward-looking infrared radar (FLIR) device, the police helicopter tactical flight officer observed a person who he believed to be the fleeing suspect on top of a roof on Potomac Avenue. The helicopter crew directed the officers on the ground, including Officer Dahl and Bandit, to that location. The tactical flight officer broadcast that the suspect had jumped from the roof and was running in the back yard. The helicopter spotlight illuminated the yard at 442 Potomac Avenue.

Several persons were in the back yard of 442 Potomac Avenue. Garcia had heard the commotion, including the police helicopter, and gone outside to see what was happening. His wife, Aricela Najera, also heard the commotion outside and she warned Garcia to stay in the house. Garcia joined the persons in the back yard of 442 Potomac Avenue.

Officer Dahl and Bandit approached the home at 442 Potomac Avenue. He saw an older man, later identified as William Pruitt, at the front of the home and told Mr. Pruitt to go back into his house. Officer Dahl was joined by Officer Rosalia Cabrera and they walked along the driveway at the right side of the house toward the back yard. Officer Dahl could neither see nor hear anyone in the back yard of 442 Potomac Avenue, but could see that it was a large yard with a shed. He sent Bandit to search the back yard. Bandit quickly veered to the east, around the corner of the house, and found the man later identified as James Garcia. Garcia brushed Bandit

away from him.  Bandit bit Garcia.  Officer Dahl saw Bandit and Garcia and believed that Bandit had apprehended the fleeing suspect.

Garcia knew that the suspect was in the tree in the back yard of 442 Potomac Avenue. Garcia told Officer Dahl that he was not the one for whom the police were searching and he pointed to Prasad in the tree above.  Dahl promptly commanded Bandit to release the bite and he took control of Bandit, allowing other officers to take Prasad into custody.  Garcia was taken to a hospital where his wounds were treated.

b.   **The Sacramento Police Department police service dog deployment policy is consistent with generally accepted policies, practices and training for police service dog teams.  The Sacramento Police Department police service dog deployment policy meets generally accepted best practices for police service dog teams.**

1.   Police service dog handlers and canine unit administrators are expected to be generally familiar with the guidelines established in the landmark case of *Graham v. Connor*.  The widely-established best practice for police service dog deployment policies in the United States is for the policy to feature three key considerations that a handler and/or supervisor should consider:

a.   The severity of the crime at issue.

b.   Whether the suspect poses an immediate threat to the safety of officers or others.

c.   Whether the suspect is actively resisting arrest or attempting to evade arrest by flight.

2.   Police service dog deployment policies minimally consider three factors:

a.   Whether there is a reasonable belief that the suspect poses an imminent threat of violence or serious harm to the public, any officer or the handler.

b.   Whether the suspect is physically resisting or threatening to resist arrest and the use of a canine reasonably appears to be necessary to overcome such resistance.

c.   Whether the suspect is believed to be concealed in an area where entry by other than the canine would pose a threat to the safety of officers or the public.

Best practice deployment policies also generally provide for consideration of additional factors in making a deployment decision. Those factors address the age of the suspect, potential danger to others during a canine search, consequences of not using the search capabilities of the canine, the seriousness of the suspected offense, the resistance, if any, shown by the suspect and the potential for escape by the suspect if the canine is not deployed.  Best practices also provide for some form of warning in most deployments, depending on individual circumstances.

3.   The Sacramento Police Department police service dog deployment policy included all of the foregoing deployment decision factors.

4.   The Sacramento Police Department police service dog deployment policy also provides that a supervisor authorize a canine deployment to search for and apprehend a suspect.  Although not entirely unique to the Sacramento Police Department, this policy provision exceeds the requirements of a great number of police service dog deployment policies currently in use in the United States.  The

supervisory involvement in the deployment decision is an important hallmark of a best practice policy.

**c.    The decision to deploy a police service dog to locate Prasad was reasonable and was consistent with generally accepted policies, practices and training for police service dog teams.**

1.    The decision to deploy a police service dog to locate a suspect is best made when both a well-trained canine handler and a supervisor consider the reported facts that are known at the time of deployment. Such decisions are necessarily often made in tense, uncertain and rapidly unfolding situations, and with limited information available and uncertain confirmation of that information. This was the case at the time of deploying the police service dog team to search for Prasad.

2.    Officer Dahl made an independent evaluation of the reported facts prior to deploying K9 Bandit to search for Prasad. Officer Dahl had the following information at the time of his decision:

a.    Prasad lead the California Highway Patrol officers on a high speed chase through a residential neighborhood, a felony crime involving a significant safety risk to the public and to officers.

b.    Prasad was actively resisting efforts to arrest him by jumping over fences in the yards of neighborhood residents.

c.    Prasad had not been searched for weapons by the California Highway Patrol officers before he fled.

*Garcia v. City of Sacramento et al.*
*Report of Kenneth R. Wallentine*          7

d.　　Prasad posed a threat to the public and to officers by jumping into back yards and trying to access sheds, where tools such as shovels, yard and maintenance tools and sledge hammers could be stolen and used as deadly weapons against the police and the public.

e.　　Prasad was running across the roof of a house at one point in his flight.

f.　　A containment perimeter had been quickly established, significantly increasing the likelihood of success for a police service dog team searching for Prasad.

During the course of the search for Prasad, Officer Dahl learned that a person believed to be the suspect was seen running through a yard contained within the established perimeter.  Such information would be significant to a trained and experienced police service dog handler in continuing and focusing a search.

3.　　Provided with the same information that was reported to or observed by Officer Dahl, a reasonable and properly trained police service dog handler would have recognized that deploying a police canine to search for and potentially apprehend Prasad was consistent with generally accepted policies, practices and training for police service dog teams.

4.　　Sergeant Hinz made an independent evaluation of the reported facts prior to authorizing deployment of Officer Dahl and K9 Bandit to search for Prasad. Sergeant Hinz had the following information at the time of her decision:

a.　　Prasad was wanted for a recently committed felony crime.

*Garcia v. City of Sacramento et al.*
*Report of Kenneth R. Wallentine*　　　　　8

    b.      Prasad was actively resisting efforts to arrest him when he stopped at the signal of the California Highway Patrol officers and then fled.

    c.      Prasad was fleeing from the police.

    d.      Prasad was running through a residential neighborhood and jumping fences across residential yards.

    e.      Prasad was running across the roof of a house at one point in his flight.

    f.      Prasad had not been searched for weapons by the California Highway Patrol officers before he fled.

    g.      Prasad could have easily hidden in a garage or back yard shed, where tools such as shovels, yard and maintenance tools and sledge hammers could be stolen and used as deadly weapons against the police and the public.

    h.      At one point, Prasad was believed to have gone into a shed, constituting a burglary crime.

5.      Provided with the same information that was reported to or observed by Sergeant Hinz, a reasonable and properly trained supervisor familiar with the abilities of a police service dog team would have recognized that deploying a police canine to search for and potentially apprehend Prasad was consistent with generally accepted policies, practices and training for police service dog teams.

d.      **The police service dog team actions in the search for Prasad were reasonable and were consistent with generally accepted policies, practices and training for police service dog teams.**

1. At the point that Officer Dahl and Bandit began to search for Prasad, Officer Dahl knew that a containment perimeter had been established.  He coordinated his search pattern with the other police service dog team (from the California Highway Patrol) involved in the search.  Officer Dahl maintained good communication with his support officers as he advanced in the search.

2. Consistent with policy and generally accepted police training and practices, Officer Frey broadcast warnings from a loudspeaker mounted on the Sacramento Police Department helicopter.  The warnings told citizens that police were in the area, a canine team was deployed in the neighborhood, citizens should go into their houses and they should lock themselves inside.  Although some of the persons at 442 Potomac did not recall hearing the warnings or did not recall their understanding, others in the area clearly heard the warnings, including Officer Cabrera.  Eriq Felix heard the warnings and acknowledged that he and the others in the back yard should have gone in the house.  Some officers did not recall hearing the warnings.  This is expected and could likely be a result of selective attention.  Aricela Najera, Garcia's wife, heard an announcement that residents should stay in their houses and she urged Garcia to stay in the house.  Garcia later acknowledged to Officer Dahl that Garcia should have stayed in his house.

3. When Officer Dahl was directed to 442 Potomac Avenue, first by the report from the helicopter tactical flight officer, Officer Frey, then by the illumination of the back yard of 442 Potomac Avenue, he saw a man, later identified as William Pruitt, standing at the front door of the house.  Officer Dahl had Bandit with him.

He told Pruitt to go back in the house. Pruitt said nothing to Officer Dahl and Pruitt went into the house.

4. Officer Dahl looked into the back yard, but he did not see nor hear anyone in the back yard. He could see that it was a large yard with a shed and other outbuildings where someone could hide. He saw that the gate was open. Officer Dahl had been told by the helicopter tactical flight officer that there was a suspect that had been on the roof of the house and the suspect now appeared to be running across the back yard. Officer Dahl had no reason to believe that anyone other than the fleeing suspect was in the back yard.

5. At the same time, Prasad had moved into a tree in the back yard at 442 Potomac Avenue. As Prasad entered the back yard, he passed right by Garcia. Garcia turned and walked along the same path and direction as Prasad. He hiding was a few feet away from Garcia, who later told police where Prasad was hiding. Garcia was standing just around the corner from Officer Dahl, though Officer Dahl could not see him as he and Officer Cabrera walked along the east side of 442 Potomac Avenue.

6. Officer Dahl believed that the fleeing suspect, Prasad, was in the back yard. Based on the information relayed from the helicopter tactical flight officer, it would be reasonable and consistent with generally accepted police practices and training for an officer to form that belief.

7.   Officer Dahl gave Bandit a search command.  Officer Dahl's decision to give the search command was a reasonable option, consistent with generally-accepted police service canine team training and practices.

8.   Bandit turned the corner to the east, just where Garcia was standing.  Garcia felt Bandit touch him and Garcia reached out to brush Bandit away.  A police service canine could interpret Garcia's move as an aggressive motion and the trained response would be to engage Garcia.  Garcia later stated that one of his hands was raised to point for his friends so that they would see Prasad in the tree.  A police service canine could also interpret a raised arm as an aggressive motion.  Garcia was also standing in a place where Bandit had just been commanded to search. Garcia had followed the path of the fleeing suspect, albeit for a short distance. The command, coupled with the immediately preceding activity of searching through the neighborhood, would prompt Bandit to search for and engage the suspect.  When Bandit turned the corner and encountered Garcia, it would have been natural for Bandit to engage Garcia as a suspect.

9.   Bandit bit Garcia.  Officer Dahl was right behind Bandit and came around the corner, believing that Bandit had found and apprehended the fleeing suspect. Bandit acted as expected, engaging what he apparently perceived as the fleeing suspect, someone who had just tried to brush him away.  Though it is truly unfortunate that Bandit bit Garcia, Bandit's actions were consistent with those of a well-trained police service canine.

10.     Officer Cabrera gave commands to the other persons who were located in the back yard of 442 Potomac Avenue. Several protested and were slow to comply. Garcia told Officer Dahl that he was not the one for whom the police were searching and Garcia pointed to Prasad's hiding place. Officer Dahl promptly commanded Bandit to "out" or to release, at the same time holding Bandit by the collar. Officer Dahl held onto Bandit's collar in a "hard out" fashion to facilitate redirecting Bandit's focus to Prasad's hiding place so that Bandit would apprehend Prasad if he fled again. Officer Dahl's prompt release command and hard out to refocus Bandit was a reasonable option, consistent with generally-accepted police service canine team training and practices.

e.   **The Sacramento Police Department properly supervised the police service dog team of Officer Gary Dahl and K9 Bandit. The supervision of the team was consistent with generally accepted policies, practices and training for police service dog teams.**

1.     As noted above, the Sacramento Police Department policy provides that a supervisor authorize a canine deployment to search for and apprehend a suspect. The supervisory involvement in the deployment decision is strongly indicative of a well-supervised police service canine unit. In this particular incident, the supervisory approval process unfolded as prescribed by the policy.

2.     Post-incident analysis and policy review is important for a well-supervised police service dog unit. The Sacramento Police Department has procedures in place for supervisory review of all police canine bites. As he did in this case, Sergeant Oliviera conducts and administrative review of each bite incident, documenting the

facts of the incident, evaluating policy compliance and scrutinizing for any training issues or any facts that might prompt a change in training or tactics. He interviews the handler involved to gain first hand perspective. He studies individual incidents and statistics to detect any trends that might suggest operational and/or training adjustment. Sergeant Oliviera's supervisory practices demonstrate his and the Sacramento Police Department's commitment to accountability and continuous improvement.

3.  Supervision of police service dog team training is another vital component of a well-supervised canine unit. Officer Dahl and his colleague canine handlers are required to attend weekly training, which includes weekly policy review and analysis of recent police service dog deployments to determine whether the deployments were harmonious with policy. This discussion includes the other Sacramento Police Department canine handlers, providing for accountability for each handler to address individual apprehensions with his or her colleagues, trainer and supervisors.

4.  Officer Dahl and Bandit are required to attend weekly training consisting of no less than four hours of formal training. Only vacation, illness or a police emergency is acceptable as a reason to miss all or part of the weekly training. Officer Dahl regularly attends and fully participates in the weekly training sessions and that attendance and participation is noted by supervisory personnel, including the trainer.

5.  Sergeant Oliviera monitors Officer Dahl's attendance and watches Officer Dahl and Bandit's performance in training. Sergeant Oliviera is also a trained and certified police service dog handler. Sergeant Oliviera regularly consults with the trainer, Steve Brewer, about the team's performance. This level of supervisory involvement, particularly with the high degree of accountability expected by the supervisor, demonstrates that the unit is well-supervised. It is instructive that the Sacramento Police Department has assigned a certified police service dog handler with the particular ability to effectively monitor canine team performance to supervise the unit.

6,  The Sacramento Police Department has developed a proprietary software application for monitoring police service dog deployments and training tasks and hours. This tool facilitates supervisory review of deployments, apprehensions, time spent in training and the breadth of training accomplished. Such a tool is indicative of a law enforcement agency intent on effectively supervising the police canine unit.

7.  The supervisory and accountability tools discussed above collectively demonstrate a high level of supervision and quality control for the Sacramento Police Department's police canine unit. This level of supervision and accountability is consistent with police canine unit supervision best practices in the United States law enforcement community.

f.    **The Sacramento Police Department properly trained the police service dog team of Officer Gary Dahl and K9 Bandit.  The training of the team was consistent with generally accepted policies, practices and training for police service dog teams.**

1.    A threshold question in evaluating the training of a police service dog team is the sufficiency of the pre-service training.  The State of California Commission of Peace Officer Standards and Training ("POST") promulgates aspirational guidelines for police patrol service canines.  The Sacramento Police Department tests each police service dog team prior to service and will not permit the team to enter service unless the team meets, at a minimum, the California POST canine guidelines.  Officer Dahl and Bandit met these guidelines prior to entering service and have consistently met and exceeded the guidelines in subsequent annual certification trials.  The training hours for the Sacramento Police Department pre-service training period significantly exceeds the training time allotted in many, if not most, pre-service police canine training programs in the nation.

2.    Though no single national accreditation entity exists for police service canine teams, the strong majority of trainers and trial judges from groups such as the Western States Police Canine Association, California Narcotic & Explosive Canine Association, United States Police Canine Association, North American Police Work Dog Association, Heart of American Police Dog Association and other similar groups, typically recommend four hours of formal canine team training per week.  The Sacramento Police Department meets this generally accepted standard.

3.   In addition to the formal weekly training, Officer Dahl spends several hours per
week performing obedience training with Bandit.  Officer Dahl is well-suited to
perform independent obedience training, having previously trained a Dutch
Shepherd and a Malinois from beginning to the point of qualifying for service at
another law enforcement agency and having served as a canine decoy.  The best
evidence of the quality and efficacy of this training is the fact that Bandit is able to
consistently work off lead while on patrol.  This is unusual in the police service
dog community.  Few law enforcement agencies require their police canines to
possess the discipline to work off lead in all circumstances because of the
commitment to frequent and intensive training that is a prerequisite to consistent
off lead patrol work.  Another example of the quality and efficacy of Officer Dahl's
individual training is that Bandit is capable of consistently performing a call-off at
great distances, as much as 60-70 yards, after identifying his apprehension target.
The California POST guideline on this point is far less rigorous.  A police service
canine's ability to perform a call-off is a strong indicator of the dog's obedience in
other tasks.  Trainer Steven Brewer reported that Bandit performs well in call-offs
and other tactical obedience tasks during the weekly training sessions.  Brewer
also observed Bandit performing well in verbal outs, or response to a verbal
command for Bandit to release from a bite.  Steven Brewer is certified by POST as
a police service dog evaluator and is particularly well-suited to observe and
evaluate Bandit's performance in training.

4.  The Sacramento Police Department retains the services of a highly qualified trainer with nearly 40 years experience in handling and training police service dogs. I am personally familiar with Steven Brewer's reputation in the police canine community. Officer Dahl and Bandit have been provided training under a highly-qualified instructor with substantial experience in the police canine community.

5.  The awards, commendations and other recognition earned by Officer Dahl demonstrate that he is well-trained. Officer Dahl's substantial portfolio of awards in his file includes award of the highly prestigious Silver Award of Valor and Bronze Award of Valor. He has also been commended for participating in personnel selection processes. Police departments generally carefully select high-performing officers to participate in such processes.

6.  Officer Dahl and Bandit successfully completed the S.K.I.D.D.S. (SWAT & K-9 Interaction During Deployment School) program and Bandit is S.K.I.D.D.S. certified. I am familiar with the development of the S.K.I.D.D.S. program and with the rigors of the training. I have attended several sessions presented by the program developer. Only very well-trained and disciplined police service dog teams successfully complete the program and attain certification. Officer Dahl and Bandit are frequently tasked to assist the Sacramento Police Department SWAT in critical situations.

7.  The Sacramento Police Department K9 Unit received a Unit Citation from the Chief of Police in 2008, in large part due to their collective demonstration of training excellence. The citation recognized that the Unit received over 50

trophies for superior performance in police service canine trials. This is a

remarkable accomplishment for a unit of just six teams at the time.

2.      In reaching my opinions in this matter I have relied upon my training and experience in

public safety acquired throughout my career. A summary of my qualifications, publications,

litigation history and fee schedule are recited herein.

3.      **My qualifications as an expert in this subject matter include the following:** I am a

law enforcement officer in the State of Utah. My primary employment is for the Utah Attorney

General, where I serve as the Chief of Law Enforcement. I was formerly employed as a Bureau

Chief at the Utah Department of Public Safety, Peace Officer Standards and Training Division,

where I supervised investigations into allegations of improper and excessive force, officer

integrity, and criminal acts alleged to have been committed by law enforcement officers and

supervised in-service training administration and certification for all peace officers in the State of

Utah. I also supervised the police service dog training and certification program for the State of

Utah. I had responsibility for policy drafting and review for the parent agency, the Utah

Department of Public Safety. I was certified as a law enforcement officer in the State of Utah in

1982. My duties include direct supervision and command of various investigative units and

agents throughout the State of Utah, supervising approximately thirty-five law enforcement

officers, forensic specialists, and technicians, as well as a dozen of part-time peace officer

employees. I command the State of Utah Child Abduction Response Team. I command the State

of Utah Officer-Involved Fatality Investigation Team. I am a member of the Board of Review of

the Utah Technical Assistance Program, consulting in cold case homicide and complex violent

person crimes investigations.  In 2010, Governor Herbert selected me for the Governor's

Leadership in Public Service award for my work in public safety leadership.

4.      I was formerly responsible for providing delivery of the Basic Training Curriculum related

to all legal subjects, as well as certain tactical subjects, at the Utah Law Enforcement Academy.  I

continue to teach at the Utah Law Enforcement Academy.  I am the author of the police academy

curriculum currently in use for several subjects, including, but not limited to, use of force,

reasonable force, use of force and police service dog teams, search and seizure, search and seizure

for police service dog teams, and use of force/firearms instructor liability.  I regularly teach in the

Basic Training programs of the Utah State Police Academy.  I regularly teach in the following

specialized courses: Advanced Officer Course, Firearms Instructor Course, Utah Drug Academy,

Utah Crime Scene Investigators Academy, Utah Sheriffs' Association Command College, First

Line Supervisor Course, POST K9 Unit Administrator Course, POST Patrol Dog Handler

Course, POST Narcotics Detector Dog Course, and others.  I am a former police service dog

handler and worked with the Uintah County Sheriff's K9 Unit from 1995 to 2001.  I continue to

provide instruction and evaluation services for the POST Police Service Dog program.  I am a

certified POST Firearms Instructor, often serving as the lead instructor for POST Firearms

courses.  I am certified by the Force Science Research Center as a Force Science Analyst ®.  I am

a certified TASER® Instructor.  I am a certified Excited Delirium and Sudden Death

Investigation Instructor.  I was certified by the Los Angeles Police Department in Officer-

Involved Shooting Investigation.

5.      I am a licensed attorney, having practiced law since 1990.  I am admitted to practice

before the United States Supreme Court, the Courts of Appeals for the Fifth and Tenth Circuits,

and the State and Federal courts in the State of Utah. I am a Master of the Bench of the
American Inns of Court, Inn One, where I also serve as the past-President of the Inn of Court. I
serve as an Administrative Law Judge for the State of Utah and for various counties and cities in
Utah, providing hearing officer and appellate hearing services for hearings involving allegations of
police officer misconduct for a variety of state agencies and municipalities. I was formerly on the
faculty of Excelsior College, teaching Criminal Procedure, Evidence and Management Strategies
for Public Safety and am responsible for course design and curriculum selection for Criminal
Procedure.

6.      In addition to my primary employment, I occasionally consult and provide expert witness
opinions on police procedures, and use of force issues. I occasionally perform in-custody death
investigations and officer-involved shooting death investigations for agencies which may lack the
requisite expertise. I am a consultant to the Utah Risk Management Mutual Association, the
state's largest insurer of public safety agencies, on matters of officer conduct and discipline, hiring
and screening practices, use of force, and police pursuit policies. I am the co-founder of, and
legal advisor to, a best practices advisory group that developed comprehensive model policies and
best practices under the authority of the Utah Chiefs of Police Association, the Utah Sheriffs'
Association and various state law enforcement agencies. These policies serve as a model for all
Utah public safety agencies. I occasionally perform in-custody death investigations and officer-
involved shooting death investigations for agencies which may lack the requisite expertise. I am
the author of a number of model policies for law enforcement agencies, and have provided policy
drafting and policy review services for several agencies, including policy drafting responsibility for
large law enforcement agencies. I have served as a contract consultant to the United States

Department of Justice, assigned to provide technical assistance and management consulting to various public safety entities in the United States.

7.      I participate and serve in a number of community and professional capacities. Professional activities pertinent to law enforcement include serving as a Past-President of the Utah Peace Officers Association, former Board Member of the Utah SWAT Association, member of the International Association of Law Enforcement Educators and Trainers Association, member of the International Association of Chiefs of Police and the Utah Chiefs of Police Association, member of the National Tactical Officers Association, member of the International Association of Law Enforcement Firearms Instructors, member of the International Association of Directors of Law Enforcement Standards and Training, member of the International Law Enforcement Educators and Trainers Association, member of the K9 Section of the Utah Peace Officers Association, member of the United States Police Canine Association, past member of the board of directors of the NAACP, Salt Lake City branch, and board member and immediate past-Chairman of the Utah Law Enforcement Legislative Committee. I formerly served as a gubernatorial appointee to the Council on Peace Officer Standards and Training. I currently frequently serve as a member *pro tempore* of the Council on Peace Officer Standards and Training. I am a former member of the Scientific Working Group on Dog and Orthogonal Detector Guidelines, a national scientific best practices organization sponsored by the Federal Bureau of Investigation, the Department of Homeland Security, and the Transportation Security Administration, with support coordinated by the International Forensic Research Institute at Florida International University.  I have been a presenter at a variety of professional conferences

and seminars, including presenting on use of force training at the annual convention of the International Association of Chiefs of Police.

8.      Since 1994, I have been a consultant with the K9 Academy for Law Enforcement and the International Police Canine Conference. My principal responsibilities are to provide use of force training, civil liability instruction, and search and seizure instruction. In the past two years, I have provided police service dog training and certification standards consultation for two police service dog organizations, including a western regional group and one of the major national groups. I serve as a consultant for the California Narcotic and Explosive Canine Association and have been a featured lecturer at their annual training conference over the past decade.

9.      I am a Senior Legal Editor for Lexipol, Inc., the nation's largest provider of policy formulation and revision for public safety agencies and policy-based training, responsible for reviewing and editing the work of legal staff in creation of policy manuals for law enforcement agencies. In that capacity, I have assisted in the drafting and review of use of force, police service dog and electronic control device policies in current use by more than 1,100 police agencies and correctional facilities in the United States.

10.     **My publications (limited to ten years) include the following:** I have previously published a number of other professional articles, many of which have been subjected to peer review. My most recent book, *The K9 Officer's Legal Handbook*, was published by Lexis/Nexis Matthew Bender in December 2008. It includes an extensive discussion of use of force by police officers. Another book, *Street Legal: A Guide to Pre-trial Criminal Procedure for Police, Prosecutors, and Defenders*, was published in 2007 by the American Bar Association Publishing Division. It is a treatise on public safety and criminal procedure, and includes multiple chapters

on search and seizure and use of force by police officers.  My other published works, limited to

the past ten years, include:  *Post Incident Video Review*, Police Chief, V. 68, No. 12 (2011);  *Cell

Site Location Evidence: A New Frontier in Cyber-Investigation*, 2011 (2) AELE Mo. L. J. 501,

*Prospects, Pitfalls and Pains of Social Media and Public Safety*, The Municipal Lawyer,

September 2010; *Police Department May Read Text Messages Sent on Agency-issued Pagers:*

*City of Ontario, California v. Quon*, Police Chief, V. 57, No. 8 (2010); *Collection of DNA Upon*

*Arrest: Expanding Investigative Frontiers*, Police Chief, V. 57, No. 1 (2010); *Targeting TASER:*

*The New TASER Aim Points,* Law Officer, January 2010; *The Risky Continuum: Abandoning the*

*Use of Force Continuum to Enhance Risk Management*, The Municipal Lawyer, July 2009;

*Explosive Detector Dog Legal Issues*, K9 Cop, February 2009; *Does Police Service Dog*

*Deployment Equal Deadly Force?*, K9 Cop, April 2009; *Human Scent Line-up Evidence*, Police

K9 Magazine, August 2009; *Acknowledging Gender in Fitness Standards for Police: An*

*Invitation to Liability?*, The Municipal Lawyer, January 2008; *K9 Court Testimony*, Police K9,

December 2006; *United States Supreme Court Review for Corrections Managers*, Corrections

Managers Report, October 2006; *Criminal Procedure: The Street Cop's Guide* (Aspen Press

2005); *Conduct Unbecoming an Officer*, The Municipal Lawyer, January, 2005; *Limits on Off-*

*Duty Police Employment*, The Municipal Lawyer, Spring 2004; *Conjugal Prison Visits*,

Corrections Manager, March, 2003; *Life in the Law* (BYU Press 2002), co-author; *Investigating*

*In-Custody Death*, Corrections Manager Report, October 2002; *Police Canine Risk*

*Management*, The Municipal Lawyer, July 2002; and a variety of columns addressing law

enforcement issues and published by PoliceOne.com.  I am the author of a reference book

currently in use in the Utah Law Enforcement Academy, as well as other police academies

throughout the United States, titled *Criminal Procedure: The Street Cop's Guide* (Aspen Press 2005). This book discusses detention and arrest of persons, use of force, and search and seizure of persons and property, among other subjects.

11.   **My fee schedule is established as follows:** I charge $250.00 per hour for examination of reports and documents, site visits, interviews, administrative tribunal, deposition or court testimony. I bill for actual travel expenses and a travel fee of $1,000.00 per day/part-day for travel to western states and $1,500.00 per day/part-day outside western states.

12.   **My prior experience as an expert witness (limited to the past four years) includes the following cases:** I have been qualified as an expert in the subject matter of police procedures, including use of TASER® devices, excessive force, shootings and wrongful death claims, search and seizure, police service dog use, both in drug detection and dog bites, and I have never had a court decline to find that I am a qualified expert witness. I have testified and/or provided depositions and trial testimony in the following cases which may be generally related to the subject of the instant litigation in the past four years: *Cavanaugh v. Woods Cross City, et al.,* No. 1:08CV00032, United States District Court of Utah, Central Division, 2011. Trial testimony given on behalf of the defendants. Subject matter: excessive force and TASER use. *Ibarra v. City of Watsonville*, Watsonville Municipal Civil Service Commission, 2011. Trial testimony given on behalf of Respondent. Subject matter: police canines and excessive use of force. *Jones v. City of Waterloo*, No. 6:10-CV-02014-LRR  United States District Court of Iowa, 2011. Trial testimony given on behalf of defendant. Subject matter: police canines. *Cardall v. Thompson, et al.* Case No. 2:10-CV-00305-CW, United States District Court of Utah, Central Division, 2011. Deposition testimony given on behalf of the defendants. Subject matter: excessive force,

*Garcia v. City of Sacramento et al.*
*Report of Kenneth R. Wallentine*          25

wrongful death. *Krause & Martin v. Manalapan Township*, Case No. 3:09-CV-0287, United States District Court of New Jersey, 2010. Deposition testimony given on behalf of defendant. Subject matter: police canines. *Mitchell v. Dow*, Case No. 2:08-CV-00726-DB, United States District Court of Utah, 2010. Trial testimony given on behalf of defendants. Subject matter: excessive force. *Al-Asadi v. City of Phoenix, et al.*, No. 2:09-CV-00047, United States District Court of Arizona, 2010. Deposition testimony given on behalf of the defendants. Subject matter: excessive force and propriety of an arrest. *United States v. Beltran-Palafox*, No.09-40022-01/02 JAR, United States District Court of Kansas, 2010. Trial testimony given on behalf of the plaintiff. Subject matter: search and seizure. *United States v. Trestyn & Herren*, No. 09-CR-00216-B, United States District Court of Wyoming, 2010. Trial testimony given on behalf of the plaintiff. Subject matter: search and seizure. *United States v. Ludwig*, No. 08-CR-00224-D, United States District Court of Wyoming, 2009. Trial testimony given on behalf of the plaintiff. Subject matter: search and seizure. *Evans v. Taylorsville City*, Case No. 2:06-CV-00631 TS, United States District Court of Utah, Central Division, 2009. Deposition testimony given on behalf of the defendants. Subject matter: improper execution of search warrant, negligent investigation. *Swofford v. Eslinger*, Case No. 6:08-CV-00066-PCF-DAB, United States District Court of Florida, Orlando Division, 2009. Deposition testimony given on behalf of the defendants. Subject matter: improper search and excessive force. *Becker v. Bateman*, Case No. 2:07-CV-311 PGC, United States District Court of Utah, Central Division, 2008. Deposition testimony given on behalf of the defendants. Subject matter: excessive force. *Salva v. Kansas City Board of Police Commissioners*, Case No. 07-CV00194-JTM, United States District Court of Missouri, Western Division, 2008. Deposition testimony given on behalf of the defendants.

Subject matter: Wrongful death. *Turnbow v. Ogden City et al.*, Case No. 1:07-CV-114, United States District Court of Utah, Central Division, 2008. Deposition testimony given on behalf of the defendants. Subject matter: Wrongful death. *Nielson v. South Salt Lake City & Burnham*, Case No. 2:06-CV-335, United States District Court of Utah, Central Division, 2008. Deposition testimony given on behalf of the defendants. Subject matter: sexual misconduct. *Trammell v. Jacksonville Beach City Police Department*, Case No. 3:06-CV-984-J-16MMH, United States District Court of Florida, Jacksonville Division, 2008. Deposition testimony given on behalf of the plaintiffs. Subject matter: excessive force.

The observations and opinions stated herein are preliminary, insofar as additional information may be provided to me through the course of discovery and other incidents of the litigation process. They are based on the best information presently known to me. I have assumed the general accuracy of the documents, statements, and reports, excepting those expressed as opinions and those conflicting one with another and/or conflicting with physical evidence, that were provided to me. The opinions herein may be supplemented and/or revised upon receipt of additional information, including, but not limited to, further deposition testimony, consideration of any report submitted by plaintiff's experts, and further investigation. I may supplement this report upon completion of depositions of witnesses in this matter and/or upon being provided with other investigative documents, and/or video and photographs.

My trial testimony may be supported by exhibits that include the pleadings, documents, statements, depositions, diagrams, photographs, and reports listed herein, as well as illustrative evidence such as a visual presentation of computer-generated slides and visual images projected

*Garcia v. City of Sacramento et al.*
*Report of Kenneth R. Wallentine*                    27

onto a screen, charts, graphs, or illustrations created to better illustrate the aforementioned documents.

## CONCLUSION

The Sacramento Police Department police service dog deployment policy is consistent with generally accepted policies, practices and training for police service dog teams. The decision to deploy a police service dog to locate Prasad after he fled from the California Highway Patrol was reasonable and was consistent with generally accepted policies, practices and training for police service dog teams. The police service dog team actions in the search for Prasad were reasonable and were consistent with generally accepted policies, practices and training for police service dog teams.

The Sacramento Police Department properly supervised the police service dog team of Officer Gary Dahl and K9 Bandit. The Sacramento Police Department properly trained the police service dog team of Officer Gary Dahl and K9 Bandit. The supervision and training of the team was consistent with generally accepted policies, practices and training for police service dog teams.

Kenneth R. Wallentine
March 7, 2012

Kenneth R. Wallentine
5272 South College Drive, Suite 200
Murray, Utah 84123

*Garcia v. City of Sacramento et al.*
*Report of Kenneth R. Wallentine*                28