Exhibit J

1              IN THE UNITED STATES DISTRICT COURT

2         IN AND FOR THE EASTERN DISTRICT OF CALIFORNIA

3

4    JAMES GARCIA,                    )
                                      )
5                      Plaintiff,     )
                                      )
6        -vs-                         ) No. 2:10-CV-00826
                                      )    JAM-KJN
7    CITY OF SACRAMENTO; City of      )
     Sacramento Chief of Police       )
8    RICHARD BRAZIEL (Badge #5030);   )
     City of Sacramento Police        )
9    Officer GARY DAHL (Badge #0672);)
     and DOES I through XX,           )
10   inclusive,                       )
                                      )
11                     Defendants.    )
     ─────────────────────────────────)

12

13

14                   Deposition of

15               OFFICER JOSH FREY

16           Thursday, February 9, 2012

17

18

19

20

21   REPORTED BY:   CATHERINE RANSOM, CSR No. 4693

22   ───────────────────────────────────────────────
                SCRIBE REPORTING & LEGAL COPYING
23             Certified Shorthand Reporters
              2315 Capitol Avenue, Suite 1010
24                 Sacramento, CA  95816

25   FAX 916-492-1222      877-453-1010      916-492-1010

                                                          1

Garcia v. City of Sacramento    February 9, 2012    OFFICER JOSH FREY

SHEET 3    PAGE 6

**PAGE 6**

1  A    Absolutely.
2  Q    And you may have been told by either the court
3  or in your training as an officer or perhaps the
4  district attorney that if there is an objection, just
5  sort of hold up for a second and let the judge rule on
6  the objection.
7  A    Correct.
8  Q    Okay. There is no judge here. So what happens
9  with an objection is that if you are able to answer the
10  question, you are supposed to answer the question and
11  the objection is saved for the judge to rule upon later.
12  So that is a real difference.
13      Another difference, though I guess not as
14  different now as it was 20 years ago, other than a
15  preliminary examination and barring what -- something
16  like an excited utterance, you have probably been told
17  in a court that you are not supposed to repeat hearsay,
18  in other words, what you may have heard from some other
19  person.
20  A    Absolutely.
21  Q    That doesn't apply at a deposition. So a
22  deposition question may appropriately ask for hearsay.
23  Also, unlike a criminal case, unless you were perhaps
24  testifying, you know, as an expert in some limited
25  circumstances, a question may appropriately ask for your

**PAGE 7**

1  impression, your opinion, what you thought, why you
2  thought something and possibly even why you thought
3  someone else was doing something. So it's perfectly all
4  right and we welcome you to qualify or explain your
5  answer. But just keep in mind that if you have less
6  than absolute personal knowledge of something doesn't
7  mean the appropriate response would be, "I don't know,"
8  or, "I'm not sure."
9      At the same time, obviously, if you don't
10  understand the question, ask me to try -- or if your
11  attorney was to ask any questions, ask me or her to
12  clarify the question, because if you answer the
13  question, the assumption is you understand it. And,
14  frankly, we prefer to have everyone on the same page to
15  the extent possible.
16  A    Sounds good.
17  Q    Anything going on in your life that would
18  interfere with you giving your best testimony here
19  today?
20  A    No.
21  Q    Okay. How long have you been a police officer?
22  A    Approximately seven-and-a-half years.
23  Q    All that with City of Sacramento?
24  A    All seven-and-a-half with the City of Sacramento
25  and three years with the probation department with the

**PAGE 8**

1  county.
2  Q    Okay. And what was your position with the
3  county?
4  A    On-call status of a probation officer. So I
5  basically filled in for probation officers when they
6  called in sick or were otherwise unable to come to work.
7  Q    Was that supervising probationers, or were you
8  working at juvenile hall and they call it probation
9  officers?
10  A    Working at juvenile hall.
11  Q    Okay. Any full-time employment before joining
12  the Sacramento Police Department?
13  A    No.
14  Q    Graduated high school, I'm sure?
15  A    Correct.
16  Q    Any college?
17  A    Sac State.
18  Q    BS in criminal justice?
19  A    BS in kinesiology.
20  Q    Okay. Did you originally think about being a
21  physical therapist?
22  A    No, just got a lot of individuals that I knew
23  from the law enforcement field that thought it was good
24  idea to not pursue criminal justice, pursue something as
25  a backup plan.

**PAGE 9**

1  Q    Okay. If you could, just briefly tell us what
2  your assignments have been with the police department,
3  either starting where you are now and going to the
4  beginning, or if it's easier for you, you can start at
5  the beginning and go forward.
6  A    Okay. Went to the -- went to police academy
7  starting 01/05 of 2005. Went through police academy
8  into field training, assigned a patrol for pretty much
9  the remainder of my career up to present.
10      During that time, in, I believe it was, late
11  2007, I started going over to the department's air
12  operations unit on a part-time basis and became a backup
13  tactical flight officer for the department, basically
14  serving when the full-time unit members were sick or
15  otherwise incapable of providing their duties. I would
16  fill in for them. And then just other than that, I was
17  a -- I am currently one of the lead defensive tactics
18  instructor for the department. And that's, again, on a
19  part-time basis as needed by the department.
20  Q    Okay. And when you say tactical flight officer,
21  is that the officer not flying the plane -- the
22  helicopter?
23  A    Correct.
24  Q    Do you have any independent, in other words,
25  before you -- without looking at anything, do you have you

Garcia v. City of Sacramento    February 9, 2012    OFFICER JOSH FREY

SHEET 4   PAGE 10

**PAGE 10**

1  any recollection of this incident that occurred
2  April 10, 2009?
3  A    I did.
4  Q    And apart from your independent recollection,
5  did you review any documents or materials -- and by
6  documents, I mean in an unusually broad sense to include
7  computer records, digital images, printouts?
8  A    I reviewed the CAD call from the dispatcher
9  officer's CAD record. I also watched the videotape that
10  I recorded.
11  Q    Okay. And the videotape, would that be the
12  infrared images taken on the FLIR system, F-L-I-R?
13  A    Correct.
14  Q    When did you do that?
15  A    I did that on the same date and time.
16  Q    What date was that?
17  A    4/10/09.
18  Q    Since then, have you looked at any of -- either
19  of those things?
20  A    I have.
21  Q    What have you looked at and when?
22  A    I have looked at the videotape two days ago, and
23  I just recently reviewed the CAD call approximately ten
24  minutes ago.
25  Q    Okay. Apart from your attorney, anyone present

10

**PAGE 11**

1  with you when you reviewed the video two days ago?
2  A    No, there was not.
3  Q    Okay. And when you say the CAD call, let me
4  show you what has been previously marked as Exhibit 11.
5  Is that the CAD call you reviewed?
6  A    Correct.
7  Q    Showing you what has been marked as Exhibit 2.
8  (Video playing.)
9  Q    Is this the video you are talking about?
10  A    Correct.
11  Q    Now, are you able to separate in your mind what
12  you remember of this incident before you saw the video
13  and looked at the catalog again from what you remember
14  after looking at that?
15  A    I'm sorry. I don't understand.
16  Q    You said you had some independent
17  recollection --
18  A    Correct.
19  Q    -- of the incident. Do you know how or what
20  manners the video and catalogs refreshed your
21  recollection, if at all?
22  A    Just to the details of the event.
23  Q    Who was the pilot of the helicopter?
24  A    It was Officer Dave Smart.
25  Q    Okay. And do you refer to that person as a

11

**PAGE 12**

1  pilot, or do you use another term for it?
2  A    Pilot.
3  Q    Okay. And you were occupying the tactical
4  flight officer position?
5  A    Correct.
6  Q    And in terms of the camera system you were
7  operating, are you looking -- what are you looking
8  through yourself when you are looking down?
9  A    Basically, it's a 12-by-12-inch monitor that is
10  situated directly in front of me, approximately 18 to
11  20 inches in front of my face.
12  Q    So are you seeing what -- in a night situation
13  such as the incident or close to night with Mr. Garcia,
14  are your observations what you see through the monitor?
15  A    That's correct but also what I view outside of
16  the ship at the same time. With our police helicopter,
17  we have the ability to slave the camera and the infrared
18  with our night or spotlight. So numerous times
19  throughout many different calls, I will both look inside
20  at the FLIR image but then again outside to get a wider,
21  broad field of view.
22  Q    Okay. Let me first direct your attention to
23  Exhibit 11 in front of you. Does Exhibit 11 -- take a
24  moment to look through it. But can you tell us what, if
25  any, entries that you made on this catalog, in other

12

**PAGE 13**

1  words, what communications you initiated that are
2  referenced.
3  A    On the third page, Air 1 checking -- Air 1 CHP
4  checking a hot spot.
5  Q    Can you give me the time on that please?
6  A    It is 2039 and 28 seconds.
7  Q    Okay. And is there any other entries?
8  A    At 2048 and 08 seconds, Air 1 states CHP unit
9  south of 442 Potomac clearing the yard.
10  Q    And any other?
11  A    No. Not on the CAD call records.
12  Q    Okay. And on this particular call -- if I call
13  it this incident, you know, what I am talking about, the
14  incident with James Garcia on April 10, 2009 -- were you
15  monitoring any radio channels?
16  A    I was.
17  Q    Which channel or channels were you monitoring?
18  A    I believe in this case, given the location we
19  are at, I was monitoring our city channel one, as well
20  as sheriff's city channel -- or county channel number
21  one also. And it could be one or two, depending, and
22  also the CHP gold channel.
23  Q    Were you aware that there were police canines on
24  the ground?
25  A    I was.

13

Garcia v. City of Sacramento   February 9, 2012   OFFICER JOSH FREY

SHEET 8   PAGE 26

**PAGE 26**

1  Q    Okay. Now, in this instance, at some point you
2  became aware -- you have seen the video a number of
3  times -- there were other people in the area?
4  A    Absolutely.
5  Q    Okay. Would it be a correct statement that at
6  the time, you were -- at the time this incident was
7  going on, you were unaware of that fact, correct?
8  A    Correct.
9  Q    Okay. And was it correct that your assumption
10  is that the units on the ground would follow the proper
11  procedures for units on the ground to make sure they
12  were safely deploying the dog?
13      MS. CHAPMAN: Objection. Vague and ambiguous.
14  A    Correct. I am assuming that all the officers
15  that I work with do the job in which they are trained
16  and required to do.
17  Q    Now, at some point, obviously, the camera
18  started recording. At what point did you start -- when
19  do you first put the camera on?
20  A    Depending on the situation, basically the minute
21  we get over get a situation, whether or not perimeter is
22  established or not. My first course of action or number
23  one priority when I get over a call such as this is to
24  maintain that perimeter and make sure that the perimeter
25  containment is very solid and that there is not any kind

26

**PAGE 27**

1  of holes or escape routes that a suspect that could be
2  hiding in that perimeter could escape or evade through.
3      As we come over those calls, I definitely --
4  again, one of my big priorities is understanding the
5  parameters of that perimeter unit, whether that be
6  drawing out a diagram or a sketch of what the street
7  names are. In this case it was -- it was quite a large
8  perimeter. So there was a lot to take in in that kind
9  of situation.
10  Q    Your understanding, though, was that based upon
11  your review of the records and your recollection, that a
12  perimeter had been established, correct?
13  A    Correct. And I don't recall if there was a
14  situation during this that I moved any perimeter units
15  or redeployed any perimeter units in this case.
16  Q    Okay. And did anyone ever advise you that the
17  individual who was being sought by the officers that
18  evening was wanted for anything other than a terminated
19  vehicle pursuit?
20      MS. CHAPMAN: Objection. Misstates the
21  evidence.
22  A    You know, I don't recall.
23      MR. KATZ: Okay.
24  A    And generally like in cases such as these, we
25  are not equipped with the same computer systems that are

27

**PAGE 28**

1  in our patrol cars. Every amount of information that we
2  receive, whether it be from dispatch or other officers,
3  is written down on a knee board. And that's how we will
4  retain that information, whether it be the call
5  location, suspect descriptions, any of that kind of
6  information.
7      As a patrol officer, you are definitely privy to
8  quite a bit more information, and you can continually
9  reference that information or pull up mug shots or do
10  any of that kind of research.
11  Q    Okay. So on the helicopter, you don't have
12  access to the same information that a ground unit would
13  have?
14  A    Correct.
15  Q    And you mentioned this E board. Can you explain
16  what that is?
17  A    A knee board is basically a small version of a
18  clipboard with elastic bands that goes around your leg
19  securing it. And that's basically your writing
20  platform?
21  Q    So the E doesn't stand for electronic?
22  A    No, no.
23  Q    Knee board? Is that what you said?
24  A    It's a knee board.
25  Q    I thought I heard the word E.

28

**PAGE 29**

1  A    No, basically situated on your leg between the
2  knee and middle of your thigh area.
3  Q    Okay. And when you are in the helicopter, are
4  you multitasking a number of different --
5  A    Absolutely. But in a situation such as this
6  where we had three separate agencies on this, generally,
7  we are in a 60-knot orbit pitched over with not a whole
8  lot of light in the cockpit. I have the controls at my
9  feet in between my leg and on my side. I am trying not
10  to bump these controls for safety of the aircraft.
11      In this case, we had all three agencies, and I
12  was talking on all three channels and actively trying to
13  function the FLIR infrared camera while maintaining
14  positions of where the multiple canine units were in
15  this kind of situation. I guess it is definitely
16  multitask.
17  Q    I want to ask the same questions. I asked
18  whether any supervisors ever reviewed this incident with
19  you, and your answer was no to that. That's correct?
20  A    Correct.
21  Q    Did Gary Dahl ever speak to you about this
22  incident?
23  A    I don't recall. I know later on, we just -- I
24  believe we probably asked whether or not it was the
25  correct individual that was apprehended. And I -- at

29

Garcia v. City of Sacramento      February 9, 2012      OFFICER JOSH FREY

SHEET 7  PAGE 22

PAGE 22

1  A    Either one.
2      MS. CHAPMAN: I think that is little clearer but
3  that's just me.
4      MR. KATZ: I think we are at the same place now.
5  Let's start.
6      MS. CHAPMAN: And the number at the bottom of
7  page, if you are uncertain of that number, you can
8  strike that.
9      MR. KATZ: Okay. Starting the video recording
10 with the audio track at 748.
11     (Video playing.)
12 A    Saying that they are code four.
13     MS. CHAPMAN: You can strike out the language
14 that doesn't appear accurate. There you go.
15 A    Okay.
16     MR. KATZ: Going to resume again at 8:00 -- or
17 eight minutes, sorry.
18     (Video playing.)
19 A    That was me. And that was 1 Charles 12,
20 control.
21     MR. KATZ: Super. Thanks. Resume again at 902.
22     (Video playing.)
23 A    Charles 12.
24     MR. KATZ: Stopping it at 931. Ready to start
25 again?

PAGE 23

1  A    (Witness nodding head.)
2      (Video playing.)
3  A    And that was me. That was Gary Dahl and that
4  was dispatch facilitating getting contact with him.
5      MR. KATZ: Sorry.
6  A    No problem.
7      (Video playing.)
8      MR. KATZ: Stopping it at ten minutes.
9  A    Can you replay that?
10     MS. CHAPMAN: No, we can do it. Audio.
11     MR. KATZ: Let's just do it this way.
12     (Playing audio.)
13 A    On top of the rooftop instead of outside.
14     MR. KATZ: Okay.
15 A    And back down was back side.
16     MR. KATZ: Okay.
17 A    And that's basically just referring to an
18 individual moving on the back side of our orbit.
19     MR. KATZ: Ready to resume the tape, ten
20 minutes. Excellent.
21     (Video playing.)
22 A    That was me. That was me.
23     MR. KATZ: I'm stopping it at 1110.
24     MS. CHAPMAN: Did you need to hear any of that
25 again?

PAGE 24

1  A    No.
2  Q    (BY MR. KATZ): Now, the audio portion that you
3  hear, is that what you heard on channel one?
4  A    That's correct.
5  Q    And did you ever hear on the evening of this
6  incident Officer Dahl inform dispatch he had given any
7  canine warnings?
8  A    No, I don't recall. It was so long ago, I don't
9  have an independent recollection of that.
10 Q    Did you give any canine warnings?
11 A    I don't recall. Again, it was so long ago. It
12 definitely is common practice for any situation where
13 you have a perimeter and a dog deployment that you give
14 canine announcements unless there is a situation where
15 the individual that you are trying to apprehend poses
16 such a great risk to the officers that officer safety
17 dictates that you don't --
18 Q    Okay.
19 A    -- give those announcements.
20 Q    As you sit here today, you don't recall one way
21 or the other whether or not you gave any warnings?
22 A    It was so long ago, I don't recall.
23 Q    In your review of the CAD records, did you
24 see -- and you reviewed the audiotape. Did you have any
25 indication that you informed dispatch that you gave such

PAGE 25

1  advisements?
2  A    And generally in cases such as these, I wouldn't
3  be the individual advising dispatch of those canine
4  announcements.
5  Q    That would be canine officer?
6  A    It would be the canine officer making the
7  request to the air unit. Generally, the way it works is
8  the canine officer will request whether or not he needs
9  announcements made for a given situation. The only time
10 where I would give announcements on my own is after that
11 canine had requested those announcements.
12     And then I maybe see individuals coming outside
13 or people in the perimeter that I don't feel should
14 belong there or pose a safety risk, then I will give
15 canine announcements on my own in that case.
16 Q    So is what you are saying is that barring
17 something that you become subjectively, personally aware
18 of, you let the canine officer -- that's his -- it's his
19 job to give the warnings or ask you to give warnings if
20 that's what he wants?
21 A    Generally, just based on the fact that we are
22 more -- a better facilitator for those announcements,
23 given the fact we have a fairly large PA system and can
24 make public announcements for wide, large areas, usually
25 they ask us to do that.

Exhibit K

UNITED STATES DISTRICT COURT

IN AND FOR THE EASTERN DISTRICT OF CALIFORNIA

---oOo---

JAMES GARCIA,

     Plaintiff,

Vs.                    No. 2:10-CV-00826
                              JAM-KJN

CITY OF SACRAMENTO and GARY DAHL,

     Defendants.

_____/

DEPOSITION OF

SACRAMENTO PD SERGEANT MICHAEL HUTCHINS

Wednesday, October 26, 2011

Reported by: Heather L. Watson, CSR No. 13432

SCRIBE REPORTING & LEGAL COPYING
Certified Shorthand Reporters
2315 Capitol Avenue, Suite 1010
Sacramento, CA  95816

FAX 916-492-1222     877-453-1010     916-492-1010

Garcia v. City of Sacramento    October 26, 2011    MICHAEL HUTCHINS, SPD SERGEANT

SHEET 9 __ PAGE 30 __

```
 1  mode.
 2  Q      Okay.  And it looks like a circle.  Almost like
 3  a sun beneath that, a circle with lines from it.  What
 4  does that represent?
 5  A      Yeah.  That's the other -- I believe the top one
 6  is gain, and the bottom one is level.  So one is for
 7  contrast, one is brightness.  Just telling you that the
 8  camera is in the manual mode to adjust for those two.
 9  Q      Now, in terms of what folks are sensed, how far
10  does the camera sense from where it's being targeted,
11  for the sensor to pick up people or heat sources?  Do
12  you understand what I'm asking?
13  A      No, I'm sorry.  I don't.
14  Q      Okay.  Looking at this image at 20:38:31,
15  there -- oh, it's hard to tell.  I guess I should have a
16  pointer.  Is it better with the light on or off for you?
17  A      No, it's okay on.
18  Q      I mean --
19         MS. CHAPMAN:  I think the court reporter would
20  prefer that.
21         MR. KATZ:  Well, they all go by touch.  They
22  don't care.  She can do it blindfold, I'm confident of
23  that.
24  Q.     BY MR. KATZ:  Well, first of all, between the
25  two top ends of the brackets above the -- what's
                                                      30
```

__ PAGE 31 __

```
 1  directly inline with the crosshair target?  Is that a
 2  heat source?
 3  A      Yes.  If -- can I borrow one of your pens here?
 4  Q      Sure.
 5  A      Are you talking about this dot here?
 6  Q      I am.
 7  A      Okay.  Yes, that is some form of a heat source.
 8  Q      Okay.  And does the ability to detect heat
 9  sources vary with how far it is from where the camera is
10  pointed?  In other words, the camera is focused on the
11  middle of the target; is that right?
12  A      Correct.
13  Q      Okay.  So in other words, if something's in the
14  middle of the target as -- let's just hypothetically say
15  in view, but 200 yards to the right looking at the
16  image --
17  A      Uh-huh.
18  Q      -- of the center of the target, would that
19  affect the infrared camera's ability to pick up the heat
20  sources?
21  A      No, it shouldn't.
22  Q      Okay.
23  A      If I understand your question correctly, is
24  if -- just to put it in these terms -- is the camera
25  less efficient looking over here (indicating) than it is
                                                      31
```

__ PAGE 32 __

```
 1  over here (indicating)?  Is that what --
 2  Q      Well, if the camera is looking where the target
 3  is, does it pick up the heat sources equally well from
 4  any of the area that's included on the film at any
 5  particular point in time?
 6  A      To the best of my knowledge, yes, it does.
 7  Q      Okay.  So let me ask you this:
 8         Looking at the image at 20:38:31, how many heat
 9  sources that appear to be humanoid do you see there?
10  A      I can't say for sure which are human.  I see a
11  variety of heat sources in the image there.  What we are
12  looking for are heat sources that really don't fit the
13  environment that they're in.  Looking at that one object
14  that you first pointed at that appears to be on the roof
15  of the one house there, looking at just that image, it
16  most likely is some sort of a vent coming out of the
17  roof of the house based on where it is in the image.
18  Q      Okay.
19  A      So our job, or the tactical flight officer's
20  job, is to identify heat sources that we see.  And if we
21  can eliminate them as being something either mechanical
22  or natural, we do that.  Those that we can't, we'll have
23  somebody on the ground check.
24  Q      Okay.  Well, let's maybe -- and I realize that
25  these images lose something when they're frozen, on top
                                                      32
```

PAGE 33 __

```
 1  of my rotations.  But looking at this, maybe starting at
 2  that point and going in a clockwise manner, can you tell
 3  us where -- if there are any other heat sources that
 4  might be associated with a human on this image?
 5  A      Looking at the center of the image, we have one,
 6  two, potentially three, four, five, all in the center
 7  there.  Again, it's very difficult, as you said, to look
 8  at one still image of a video as we're moving in a
 9  circle or an orbit on the top of it, because they're
10  constantly changing with whatever from the environment
11  could be blocking part of that heat source.
12  Q      Okay.  Now, going to the right -- in other
13  words, sort of inline with the PCORR, about halfway up.
14  Are these additional -- can you tell at this point
15  whether these are people, as well?
16  A      I can't say.
17  Q      Okay.  Let me start this again.
18  A      Okay.
19  Q      Stopping it at 20:38:33, does that tell you
20  whether or not there are additional folks outside?
21  A      It looks like they are.  One of the things that
22  we look at in watching the video is is it moving or is
23  it a still object?  Obviously, if it's moving and it
24  appears to be walking upright like a human, we can say
25  yes, that's a person.  Or it's on four legs.
                                                      33
```

Exhibit L

IN THE UNITED STATES DISTRICT COURT

IN AND FOR THE EASTERN DISTRICT OF CALIFORNIA

```
JAMES GARCIA,                  )
                               )
              Plaintiff,       )
                               )
     -vs-                      ) No. 2:10-CV-00826
                               )    JAM-KJN
CITY OF SACRAMENTO; City of    )
Sacramento Chief of Police     )
RICHARD BRAZIEL (Badge #5030); )
City of Sacramento Police      )
Officer GARY DAHL (Badge #0672);)
and DOES I through XX,         )
inclusive,                     )
                               )
              Defendants.      )
                               )
```

Deposition of

LIEUTENANT DAVE PELETTA

TUESDAY, JANUARY 31, 2012

REPORTED BY:   CATHERINE RANSOM, CSR No. 4693

SCRIBE REPORTING & LEGAL COPYING
Certified Shorthand Reporters
2315 Capitol Avenue, Suite 1010
Sacramento, CA  95816

FAX 916-492-1222      877-453-1010      916-492-1010

1

Garcia v. City of Sacramento    January 31, 2012    Lt. DAVE PELETTA

SHEET 3   PAGE 6

1 that would interfere with you giving your best testimony
2 here today?
3 A    No.
4 Q    Okay. And as I believe we discussed earlier,
5 you will have an opportunity to review your transcript
6 when it's in a written form and make any changes that
7 you believe are necessary. Would you promise to take
8 advantage of that opportunity that will be given?
9 A    Yes.
10 Q    Okay. When did you first learn that you were
11 going to be deposed in this matter?
12 A    On today's deal or the one I was here for last
13 time?
14 Q    Any deposition in this case.
15 A    I can't recall.
16 Q    Okay. What is your best estimate as to how long
17 you have been aware of the fact you were going to be
18 deposed?
19 A    I am guessing two months, at least.
20 Q    All right. In those two months, have you
21 reviewed any materials? And by materials, I mean
22 written documents, computer screens, printouts, data
23 bases, video, notes, photographs? Have you reviewed any
24 materials regarding the Garcia matter? And by the
25 Garcia matter, I am referring to Mr. Garcia being bitten

6

PAGE 7

1 by a Sacramento police canine, on, I want to say,
2 April 10, 2009?
3 A    Yes.
4 Q    Okay. What materials have you reviewed?
5 A    The accidental bite review completed by Sergeant
6 Steve Oliveira, the FLIR video that was submitted by the
7 air unit and the report generated by Officer Dahl
8 surrounding the incident, itself.
9 Q    And when you say the report by Officer Dahl,
10 which report are you referring to?
11 A    The report that was generated that night as part
12 of this incident listing Garcia in the report. I don't
13 remember what the report number was.
14 Q    Okay. My question is: Was this a casualty
15 report or arrest report?
16 A    It -- I don't recall exactly what it was labeled
17 as. If it was just him, meaning Garcia himself, that
18 would have been a casualty report, because generally
19 what ends up happening is if we have an accidental, such
20 as Garcia was, it would be generated on a casualty
21 report. And if we made an arrest out of the deal, that
22 would still be a separate arrest report.
23 Q    Let me show you what has been previously marked
24 as Exhibit 14. Is this the report that you reviewed?
25     MS. CHAPMAN: If you are looking for Officer

7

PAGE 8

1 Dahl's observations, they are on page 23.
2 A    I saw them, thank you.
3     Yes, it is.
4 Q    (BY MR. KATZ): Okay. And just so we are clear,
5 showing you Exhibit 15, was this a report you reviewed
6 prior to coming here today or not?
7 A    No. I only reviewed 14, not 15.
8 Q    Show you what has been previously marked as
9 Exhibit 32. Is Exhibit 32 a document you reviewed prior
10 to coming in here today?
11 A    Yes.
12 Q    And how would you describe what that document
13 is?
14 A    It's referred to as an accidental bite review.
15 It's where independent party from the canine or myself
16 would go out and review all the facts. We have an
17 accidental bite, we put facts onto a memo and submit it
18 up the chain of command for review.
19 Q    Okay. And you reserved the FLIR video?
20 A    Correct.
21 Q    Shows you what's been marked as Exhibit 2 to the
22 deposition of Hutchins.
23     (Video playing.)
24 Q    Is this what you described as the FLIR video?
25 A    You have to play it.

8

PAGE 9

1     (Video playing.)
2 A    Yes, that's the video I reviewed.
3 Q    And how many times have you seen that video?
4 A    At least six or seven times.
5 Q    Okay. And are you experienced in watching these
6 videos? In other words, is this the only time in your
7 career you had a look at one of these videos?
8     MS. CHAPMAN: Objection. Vague and ambiguous.
9 You mean a FLIR video?
10 A    I'm not sure that you are asking me.
11 Q    (BY MR. KATZ): Have you ever on any previous
12 occasion in connection with any other case watched an
13 infra-red video taken of a FLIR, F-L-I-R, camera system
14 from a department helicopter?
15 A    Yes, I have.
16 Q    For how many separate incidents have you done so
17 prior to today?
18 A    More than 12, at least.
19 Q    Okay. And would your best estimate be more than
20 a dozen, correct?
21 A    Yes.
22 Q    Would you have a less-than number or would -- In
23 other words, less than a hundred, less than 50, less
24 than two dozen, if you can be any more specific?
25 A    I can't be any more specific.

9

**Scribe Reporting & Legal Copying**
(916) 492-1010                    FAX (916) 492-1222

Garcia v. City of Sacramento    January 31, 2012    Lt. DAVE PELETTA

**PAGE 10**

1  Q    Okay. And on any of those occasions, did you
2  watch the video more than a single time?
3  A    Sure.
4  Q    Okay. When did you first watch the video from
5  April 10, 2009 concerning James Garcia?
6  A    I couldn't tell you the exact date. Generally,
7  what ends up happening is the sergeant or officer in
8  charge of the canine division would go out, in this
9  case, because there was some controversy behind the
10 bite, itself, would go to the scene directly that day.
11     Now, from that point on, we're kind of at the
12 will of the helicopter pilots to get us a copy of the
13 actual video and submit to us, because we don't have
14 access to that independent of them. When did I actually
15 see it? I couldn't tell you. It's been so long.
16 Q    Was it before or after Mr. Garcia filed a claim
17 for damages against the City of Sacramento?
18 A    It would have been timely from this memo being
19 submitted. So if I had to guess, I would say within two
20 weeks of the memo. It had nothing to do with him
21 submitting a claim. It's part of my review process for
22 any canine-type bites if it's available.
23 Q    What was your purpose in reviewing the video?
24 A    Make sure there is no training issues, make sure
25 there is no other underlying issues whether it be for

10

**PAGE 11**

1  patrol or canine that would need to be addressed.
2  Q    And what would be a training issue?
3  A    Well, are we talking about this one in general
4  or --
5  Q    In general.
6  A    Well, if we are talking specifically canine, to
7  see if the deployment meets the canine policy. And if I
8  didn't, then it would be a training issue with me with
9  the team to sit down, for me to go to the team and say,
10 "Hey, review this. Let's take a look at it. These are
11 the concerns that I have."
12 Q    Okay. Any other training issues when you are
13 looking at a video?
14 A    We could go on for a long time. You know, are
15 the officers doing the right things with the searches,
16 are they setting up their perimeters, are they
17 communicating correctly, are we using the equipment
18 correctly? In other words, should we be using the
19 canine here or not be using the canine here? Are the
20 appropriate number of officers involved? Is the
21 helicopter doing what it should do with regards to FLIR
22 versus spotlight? I could probably go on for a long
23 time.
24 Q    Okay. So in addition to training issues,
25 generally, what else would you be reviewing a helicopter

11

**PAGE 12**

1  video for?
2  A    Officer safety issues.
3  Q    Now, if I refer to this incident, will you
4  understand I am talking about the bite of James Garcia
5  by the Sacramento Police Department police dog that gave
6  rise to this lawsuit?
7  A    Yes.
8  Q    And if I am talking about at the time, or at the
9  time of the incident, you will understand that also
10 refers to April 10, 2009?
11 A    Yes.
12 Q    And if I am referring to Officer Dahl as Dahl,
13 you will understand who I am talking about?
14 A    Yes.
15 Q    And if I refer to his dog, in reference to Dahl,
16 you understand that's the dog who apparently is named
17 Bandit?
18 A    Yes.
19 Q    Okay. Now, when you watched this video, at any
20 time, did you observe any training issues?
21 A    Yes.
22 Q    Which training issue or issues did you observe?
23 A    The lack of communication between the ground
24 units and the helicopter observer.
25 Q    Any other issues?

12

**PAGE 13**

1  A    That was the glaring one out of this one.
2  Q    And what do you mean by the lack of
3  communication between the ground and air units?
4  A    Our ground -- excuse me, our helicopter units
5  train that if they see -- and in this instance, you can
6  see hot spots which the FLIR picks up on. It senses
7  heat. If there is more than one hot spot, that is
8  supposed to be communicated to the ground unit so they
9  can make a decision based on how they are going to
10 deploy their resources.
11     If there is one hot spot -- back up. If that is
12 not communicated, then it's assumed that the only hot
13 spot that they keep referring to is a sole person in
14 that whatever perimeter, yard, or whatever the case may
15 be. So we operate on that theory, and that's what we
16 have done as long as I have known the helicopter to be
17 up.
18     In this case, when you observe the video, you
19 will see there is multiple hot spots in the same small
20 geographical area where Mr. Garcia is, the suspect
21 hiding in the tree and through the fence. There is
22 additional hot spots. That was not communicated. And
23 that's important, because it changes the way that an
24 officer or canine would approach something.
25     They may or may not go in that backyard. They

13

Garcia v. City of Sacramento    January 31, 2012    Lt. DAVE PELETTA

SHEET 5  PAGE 14

**PAGE 14**

1  may or may not deploy the dog. They may just set up a
2  larger perimeter, a perimeter based on that knowledge
3  from the area above.
4  Q    Now, is it memorialized on any memo, order or
5  document that there is an implicit understanding that
6  without communication to the contrary, there would only
7  be a single subject in an area where the helicopter has
8  identified the person?
9  A    Not I am aware. Just practice.
10  Q    Okay. And did you observe -- first of all, did
11  any officer on the ground ask the helicopter unit
12  whether there were multiple people in the yard?
13  A    No.
14  Q    Is there any reason the ground unit could not
15  have done that?
16    MS. CHAPMAN: Objection. Calls for speculation,
17  lacks foundation. You can still answer.
18  A    I know. No.
19  Q    (BY MR. KATZ): Okay.
20  A    No.
21  Q    Did you ever discuss this video specifically
22  with Officer Dahl?
23  A    Not specifically with Officer Dahl but with
24  Sergeant Oliveira and Sergeant Hutchins.
25  Q    Did you ever discuss this incident any time in a

**PAGE 15**

1  discussion where Officer Dahl was present?
2  A    It was sometime after the incident happened, but
3  I couldn't tell you exactly when.
4  Q    What was the context of that discussion,
5  lieutenant?
6  A    Just to make sure I understood all the facts and
7  the memo that I read, there wasn't missing anything.
8  Q    Okay. And where did that discussion take place?
9  A    In the canine office.
10  Q    Okay. Were there any other persons present for
11  that conversation?
12  A    I don't recall.
13  Q    What is your recollection as to how long that
14  conversation lasted?
15  A    A couple of minutes.
16  Q    Okay. Did you ask Dahl why he hadn't asked the
17  helicopter whether or not there were more than one heat
18  source in the backyard?
19  A    No.
20  Q    Did you discuss with -- sorry. You said you
21  also had a discussion with Sergeant Oliveira and
22  Sergeant Hutchins?
23  A    Correct.
24  Q    Were the three of you present in a single
25  location at any given time?

**PAGE 16**

1  A    Independent conversations.
2  Q    Separate conversations, correct?
3  A    Correct.
4  Q    How many conversations did you have regarding
5  this incident with Sergeant Oliveira?
6  A    Probably more than ten, especially since we know
7  that we would were being sued over it.
8  Q    Okay. And how do you feel about the fact that
9  the City of Sacramento is being sued over this?
10    MS. CHAPMAN: Objection. Relevance.
11  A    I don't have an opinion either way. I mean, I
12  don't like that the city is getting sued over something
13  that I supervised. But still, we are here today.
14  Q    (BY MR. KATZ): Okay. And how many
15  conversations did you have with Sergeant Hutchins
16  regarding this incident?
17  A    Probably two.
18  Q    Did you ever discuss with Sergeant Oliveira
19  Officer Dahl's failure to ask for additional information
20  from the air unit regarding who was in the backyard
21  prior to deploying the dog?
22    MS. CHAPMAN: Objection, vague and ambiguous and
23  also argumentative.
24  A    You have to rephrase that one. Sorry.
25  Q    Okay. Is it correct that you noted that there

**PAGE 17**

1  was a training issue regarding the communication or lack
2  thereof between the ground unit and the air unit?
3  A    Yes.
4  Q    And would it be a fair statement to say that
5  failure went both ways?
6    MS. CHAPMAN: Objection. Vague and ambiguous.
7  A    No.
8  Q    (BY MR. KATZ): Okay. So the failure to
9  communicate was solely with the air unit, correct?
10  A    It deviated from our standard of practice that
11  most all officers are used to from them.
12  Q    Okay. Did you ever have any discussion with
13  anyone as to why Officer Dahl did not inquire of the air
14  unit as to who or whom was in the backyard potentially?
15  And by the backyard, I mean the yard in which Mr. Garcia
16  was bit.
17  A    I don't recall.
18  Q    Okay. Did you discuss the communication issue
19  with Sergeant Hutchins?
20  A    You are talking about the lack of communication
21  with the helicopter.
22  Q    Yes, the training issue regarding --
23  A    At least twice.
24  Q    Okay. And what is your best recollection as to
25  what the sum and substance of that conversation was?

Garcia v. City of Sacramento   January 31, 2012   Lt. DAVE PELETTA

SHEET 7   PAGE 22

1  Q    Sure.
2  A    And put it in perspective.
3      MS. CHAPMAN: I am going to object to the
4  exhibit on the grounds we have no idea when, where, how
5  that exhibit was created or if it's factually accurate.
6  But, Lieutenant Peletta, you can still answer the
7  question if you are able.
8  A    So I am seeing Indiana, Wisconsin, Curran and
9  Potomac. So three-and-a-half, four blocks, depended on
10 what side of the street the suspect left his car.
11 Q    Okay. Now, Lieutenant, does Exhibit 2 appear to
12 accurately reflect the lay-out of the streets in that
13 area?
14 A    I am looking at a map. I don't know.
15 Q    Well, you have looked -- you are familiar with
16 that area of Sacramento?
17 A    Not like the back of my hand. But from what I
18 remember it, yes.
19 Q    Okay. So is it a correct statement that it
20 would not be the practice of Sacramento to give canine
21 warnings when going yard to yard and looking for a
22 person?
23      MS. CHAPMAN: Objection, vague and ambiguous.
24 A    No, it's not.
25 Q    (BY MR. KATZ): Okay. And that was the case at
                                                          22

PAGE 23

1  the time of this incident, as well, correct?
2  A    That's correct.
3  Q    So from your perspective, a warning given or
4  broadcasted several blocks away when the officers were
5  chasing a particular subject, any additional warnings,
6  going yard to yard, would have been superfluous given
7  the person had not surrendered already?
8      MS. CHAPMAN: Objection, vague and ambiguous.
9  A    Your question is making an assumption, because
10 if you had a car -- I'll use a car for an example, that
11 he's in front of the house here. You could probably use
12 your definition. But as we all know, a helicopter
13 orbits and they encompass more of an area as they are
14 doing the orbiting. So they are not staying in this one
15 block area. They are encompassing several blocks when
16 they are doing the orbit. So I don't know if that
17 answers your question but, no, it's not one block.
18 Q    So it's not -- it would not be given yard to
19 yard, correct?
20 A    It still wouldn't be given yard to yard, no.
21 Q    And would you have an understanding as to
22 approximately how many residents were in a
23 three-and-a-half block radius of Mr. Garcia's home?
24 A    I don't know. I have no idea.
25 Q    Was it your understanding that this event took
                                                          23

PAGE 24

1  place in a residential area?
2  A    Yes, it is.
3  Q    And I realize -- I don't realize, but I don't
4  know if you are an expert in city planning, but do you
5  have any idea as to the density of the housing units in
6  that part of town?
7  A    I don't know.
8  Q    Okay. Do you have any understanding as to
9  whether or not Sergeant Hutchins or any other supervisor
10 with the Sacramento Police Department formally
11 admonished or disciplined the observer in the helicopter
12 at the time of this incident?
13      MS. CHAPMAN: I'm going to object and instruct
14 the witness not to answer that. Invades the helicopter
15 observer, who I understand is a police officer,
16 privacy --
17 A    Yes, that's correct.
18 Q    -- right to privacy.
19      MR. KATZ: Okay. Well, when we talk to the
20 judge, we can ask about that question. Are you
21 instructing him not to answer?
22      MS. CHAPMAN: I am instructing the witness not
23 to release information that is subject to an officer's
24 right to privacy. The information you requested is
25 personnel information. Also, object on the grounds it
                                                          24

PAGE 25

1  is irrelevant.
2  Q    (BY MR. KATZ): Okay. And did Officer Dahl give
3  you -- tell you that anything was omitted that -- of
4  significance from any report that he prepared regarding
5  the incident with Mr. Garcia?
6  A    No.
7  Q    Did you have an understanding as to whether or
8  not the dog responded to Officer Dahl's verbal direction
9  to disengage from Garcia?
10      MS. CHAPMAN: Objection. Vague and ambiguous.
11 By dog, do you mean police canine Bandit? There was
12 more than one police dog on the scene.
13      MR. KATZ: I told you that for the purpose of
14 this deposition, if I am talking about the dog, I am
15 only talking about Bandit.
16      MS. CHAPMAN: You referred to it as "his dog."
17 In this case, you generally said "the dog."
18      There was also a CHP dog on the scene.
19 A    Repeat your question one more time.
20 Q    Would you read it back please.
21      (Record read by the court reporter.)
22      MS. CHAPMAN: I'm going to object, vague and
23 ambiguous as to disengage, as well.
24 A    Are you asking if the dog outed when the handler
25 told him to?
                                                          25

**Scribe Reporting & Legal Copying**
(916) 492-1010                    FAX (916) 492-1222

Garcia v. City of Sacramento   January 31, 2012   Lt. DAVE PELETTA

SHEET 8   PAGE 26

1  Q   (BY MR. KATZ): And by -- yes.
2  A   Okay. I wasn't told anything different.
3  Q   And by not being told anything different, what
4  did that mean to you?
5  A   That when Bandit was called out, he responded
6  appropriately.
7  Q   And when you use the term called out, is it
8  correct that that means in response to a verbal command,
9  the dog ceased biting whoever it was the dog was biting?
10  A   That's correct.
11  Q   And just so we are clear, do you have any
12  information that a dog other than Bandit bit Mr. Garcia
13  on April 10, 2009?
14  A   You will have to ask me that one more time
15  please.
16  Q   Do you have any reason to believe that any dog
17  other than Bandit bit Mr. Garcia?
18  A   No, I do not.
19  Q   Do you have any reason to believe that a highway
20  patrol dog bit Mr. Garcia?
21  A   No.
22  Q   Did Officer Dahl, to the best of your knowledge,
23  give any directions to any highway patrol dogs on the
24  night of April 10, 2009?
25  A   I don't know the answer to that. Not when it

26

PAGE 27

1  came to the actual bite that we were reviewing on the
2  screen here. Now, prior to that or were they searching
3  in unison with each other? I don't know the answer to
4  that.
5  Q   Did anyone ever tell you the CHP dog dispatched
6  in connection with the incident that Mr. Garcia was
7  bitten in had come in contact with any person?
8  A   No.
9  Q   Are you familiar with the term hard-out?
10  A   Yes.
11  Q   What does hard-out mean?
12  A   It's when a handler actually has to pull the dog
13  off of somebody.
14  Q   Did you have an understanding as to whether or
15  not a hard-out was used to separate Bandit from
16  Mr. Garcia?
17  A   No.
18  Q   In the absence of any understanding in that --
19  in any communication in that regard, it would be your
20  assumption, based upon the practices of the canine unit,
21  that that would communicate to you that a hard-out was
22  not necessary?
23  A   That's correct.
24  Q   Okay. Sir, are you aware of the fact that the
25  dog bit Garcia after the officer made a hard-out?

27

PAGE 28

1       MS. CHAPMAN: Objection. Misstates testimony.
2  Also assumes facts not in evidence.
3  A   No.
4  Q   (BY MR. KATZ): Did you observe in the video the
5  dog biting Mr. Garcia a separate time after the officer
6  pulled him off?
7       MS. CHAPMAN: Same objections.
8  A   No.
9  Q   (BY MR. KATZ): Did you have an understanding as
10  to whether or not the dog attempted to bite Mr. Garcia
11  after the officer -- Officer Dahl pulled the dog off
12  Garcia?
13  A   No.
14  Q   You didn't observe that on the video?
15  A   No.
16  Q   Now, if you were to observe that, if that is
17  what occurred, would that change your opinion as to
18  whether or not there was a training issue in connection
19  with this incident?
20       MS. CHAPMAN: Objection. Calls for speculation,
21  lacks foundation, also incomplete hypothetical.
22  A   You have to reask the question, because it's a
23  little vague.
24  Q   (BY MR. KATZ): Your assumption was, first of
25  all -- did -- you watched the video, correct?

28

PAGE 29

1  A   Yes.
2  Q   And you didn't see the dog bite Mr. Garcia a
3  second time?
4       MS. CHAPMAN: Objection. Vague and ambiguous.
5  A   No.
6  Q   (BY MR. KATZ): Let me replay it and see, if you
7  don't mind, if you take a look at that.
8       (Video playing.)
9  Q   (BY MR. KATZ): Lieutenant, would it be a
10  training issue if the dog, in fact, attempted to rebite
11  a person after the officer had called the dog off?
12       MS. CHAPMAN: Objection. Calls for speculation,
13  lacks foundation, incomplete hypothetical, also vague
14  and ambiguous.
15  A   If there was no threat, then yes.
16  Q   (BY MR. KATZ): Have you ever addressed with
17  Officer Dahl any issues regarding his dog not responding
18  to call-offs?
19  A   No, not that I can recall.
20  Q   Okay. And having watched that again, you don't
21  see the dog lunging at Mr. Garcia again?
22  A   You asked me if he bit the person. And, no, I
23  didn't see him -- yeah, the dog lunged towards him, but
24  it doesn't mean that Mr. Garcia sustained a bite as a
25  result of that.

29

Garcia v. City of Sacramento    January 31, 2012    Lt. DAVE PELETTA

SHEET 11  PAGE 38

**PAGE 38**

1  control, officer safety and survival classes. I might
2  be missing one or two.
3  Q    What was your first assignment with the
4  Sacramento Police Department?
5  A    Police officer on the streets.
6  Q    And how long did you have that position?
7  A    Ten years.
8  Q    Did you participate in any particular special
9  assignments while a patrol officer?
10 A    Yes. Pulled for various task forces, and lack
11 of better terms, like violent crime supression teams.
12 Q    Okay. And after being a patrol officer for
13 approximately ten years, what did your assignment become
14 around 2002?
15 A    No, '87 to '97.
16 Q    Sorry.
17 A    I promoted to police sergeant then, where I held
18 four different positions as a sergeant throughout the
19 years.
20 Q    What positions were those?
21 A    Worked patrol, was assigned to our reserve,
22 special events; marine unit, took a team, drug
23 elimination task force team in Franklin
24 Villa/Meadowview, was assigned to our undercover
25 narcotics division, and then finished by being a
                                                    38

**PAGE 39**

1  sergeant in our internal affairs division.
2  Q    How long were you there?
3  A    Two years, nine months, 14 days.
4  Q    And how long were you with the undercover
5  division?
6  A    Just under three years, I believe it was.
7  Q    And how long with the marine patrol, special
8  operations?
9  A    Two years for the previous two assignments.
10 Q    And why is it you remember the year, date and
11 month for internal affairs?
12 A    It's a long time to be there.
13 Q    And what was your job after you left internal
14 affairs?
15 A    I was promoted to lieutenant, where I became a
16 watch commander.
17 Q    When did you promote to lieutenant?
18 A    2004, I believe it was.
19 Q    And for how long were you a watch commander?
20 A    Three-and-a-half years.
21 Q    And what were you the watch commander of?
22 A    The city.
23 Q    Was there a single watch commander?
24 A    Most of the time, I was.
25 Q    Did you work graveyard?
                                                    39

**PAGE 40**

1  A    I worked all shifts. I started off on
2  graveyard -- I take it back. I started off on day shift
3  for couple of months, did a year on graveyard and the
4  remainder of my time was on swing shift, mid watch.
5  Q    What's your next assignment?
6  A    Where I am at right now, in special operations.
7  Q    What does that include?
8  A    I have the special operations division under our
9  Metro section. Metro is just a name for the section.
10 My responsibilities include overseeing canine. We used
11 to have a parolee intervention team, once again, our
12 special events reserve unit and our SWAT division.
13 Q    Okay. When you were patrol officer, did you
14 ever shoot a dog?
15 A    No.
16 Q    When you have been a supervisor, have any
17 subordinates, to the best of your --
18 A    Let me back that up. Shoot a dog as in like
19 shoot it to kill it? Because I have shot dogs before in
20 all capacities. But shooting a dog doesn't necessarily
21 mean shooting it with your handgun. It can be a less
22 lethal gun. And yes, I have.
23 Q    Okay. How many occasions have you shot a dog?
24    MS. CHAPMAN: Objection. Relevance.
25 A    At least five.
                                                    40

**PAGE 41**

1  Q    Okay. And were any of those with a firearm, in
2  other words, a gun that shoots a typically lethal
3  projectile?
4     MS. CHAPMAN: Objection. Relevance.
5  A    No.
6  Q    (BY MR. KATZ): What were the circumstances in
7  which you -- were all those in connection with
8  employment with the police department?
9  A    Every single one.
10 Q    And what were the circumstances of those
11 shootings, to the best of your recollection?
12    MS. CHAPMAN: Objection, relevance.
13 A    Almost always serving search warrants of some
14 sort.
15 Q    (BY MR. KATZ): What would you shoot the dogs
16 with?
17 A    Beanbag gun, pepper ball gun are the most common
18 things we use.
19 Q    Why would you do that?
20 A    So we didn't have to kill it.
21 Q    And why would you have to kill it?
22 A    Typically, when we are serving search warrants
23 on houses, they have aggressive dogs to protect their
24 homes. So in order for us to execute the search warrant
25 safely and not get bit by the dog, we have some sort of
                                                    41

Garcia v. City of Sacramento   January 31, 2012   Lt. DAVE PELETTA

SHEET 17   PAGE 62

PAGE 62

1 evidence.
2 Q   (BY MR. KATZ): I'll ask the question again.
3 Your understanding is that the dog was chasing someone
4 other than Mr. Garcia, correct? The officers were
5 pursuing someone?
6 A   Yes.
7 Q   And at some point, you come to learn that
8 gentleman's name was Mr. Prasad?
9 A   I think that was his name, yeah, yes.
10 Q   Do you have any understanding as to why Bandit
11 did not smell Mr. Prasad's fear and go towards
12 Mr. Prasad?
13      MS. CHAPMAN: Objection. Assumes facts not in
14 evidence.
15 A   You are asking me for my opinion. And all I can
16 assume, based on that video, is the suspect ran right
17 past Mr. Garcia. So his fear scent is in close
18 proximity with where Mr. Garcia was standing.
19 Q   (BY MR. KATZ): Okay. Is it your belief that if
20 Officer Dahl had sent Bandit into the backyard of 442
21 Potomac, in which there are approximately seven people,
22 that the dog would have gone after the person they are
23 looking for?
24 A   Officer Dahl wouldn't have sent the dog in the
25 back where there was seven people.

62

PAGE 63

1 Q   Why not?
2 A   We can't control, at that point, where the dog
3 is going to go unless we have a direct view of somebody,
4 and we can give a direct scent to that dog. And it's
5 nighttime, just too many other factor that we can't
6 control.
7 Q   What about if -- change the situation. Assume
8 everything is the same, except instead of being seven
9 people, there are six. Would the dog be released to
10 find the right person?
11 A   We still wouldn't deploy in that manner.
12 Q   Why not?
13 A   Once again, it's nighttime. There is too many
14 uncontrolled circumstances there.
15 Q   What about if there were five people in the
16 yard?
17 A   My argument is going to stay the same.
18 Q   Whether there with was two people in the
19 backyard?
20 A   Same.
21 Q   And that's because there is a good chance the
22 dog is going to bite an uninvolved citizen or person,
23 correct?
24 A   The potential exists.
25 Q   Now, as head of the canine unit, do you keep

63

PAGE 64

1 track of the injuries inflicted by the department's
2 dogs?
3 A   No.
4 Q   Why not?
5 A   There is no reason to.
6 Q   Okay. Now, are you familiar with an Aaron
7 Thompson?
8 A   Yes.
9 Q   Is he presently Sergeant Thompson or Officer
10 Thompson?
11 A   He's an officer in the canine unit.
12 Q   Okay. At some point, did you learn that Officer
13 Thompson, in conjunction with Officer Hefner, offered
14 Mr. Garcia money to end this matter?
15 A   Yes.
16 Q   Was that done with the department's approval?
17 A   Yes.
18 Q   Is that standard procedure?
19 A   Yes.
20 Q   And the officers carry -- do they have cash for
21 that purpose?
22 A   Go to the ATM.
23 Q   Okay. How many times since you have been head
24 of the canine unit have officers paid off individuals
25 for being bit?

64

PAGE 65

1      MS. CHAPMAN: Objection, relevance.
2 A   Six to eight times.
3 Q   (BY MR. KATZ): Okay. And you went to the
4 canine unit when?
5 A   2008.
6 Q   And how many of those pay-offs occurred prior to
7 Mr. Garcia's incident?
8 A   I don't remember.
9 Q   What is your best estimate?
10 A   I just don't recall. It was 2009. I would be
11 guessing.
12 Q   Okay. Had it occurred prior to Mr. Garcia?
13 A   Yes.
14 Q   Have they ever, since you have been there, ever
15 paid money to a suspect who was bitten?
16 A   A suspect?
17 Q   Yes.
18 A   No.
19 Q   So these pay-offs were all to nonsuspect bites?
20 A   Yes.
21 Q   And how is it they come up with an amount to
22 tempt the person with?
23 A   It's generally based on our -- drawing a blank
24 on their name. Risk in the city.
25 Q   Risk management?

65

Garcia v. City of Sacramento   January 31, 2012   Lt. DAVE PELETTA

SHEET 19  PAGE 70

PAGE 70

1  Q    Have you ever found a deployment of a canine to
2  be outside of the department's policy?
3  A    No.
4  Q    Now, on that same paragraph, I'm going to count
5  lines down just because I think that's the easiest way
6  to reference it.  So one, two, three, four, five, six --
7  nine, ten -- 14th line down.
8  A    Starts with?
9  Q    "Officer Dahl did not --"
10  A    Yes.
11  Q    Okay.  Now, that line says, "Officer Dahl did
12  not deploy canine Bandit until he reached the rear gate
13  of the house and could see a majority of the backyard."
14       When you read Sergeant Oliveira's memorandum,
15  was it your understanding that at the time that the dog
16  was released, Officer Dahl had reached the gate into the
17  backyard?
18  A    Yes, or thereabouts.
19  Q    In reviewing the video, did you, in fact -- did
20  that individual -- in fact, the dog was released prior
21  to Officer Dahl going under the carport?
22  A    You to have play it again.  I don't --
23  Q    Okay.
24  A    I don't recall.
25  Q    That's fine.

70

PAGE 71

1    MR. KATZ: For whatever reason, not the easiest
2  thing to play.  Actually, I think this would probably be
3  a good time for the break because you need to get some
4  things from your car, do the call and also address the
5  issue with the observer.
6       (Recess taken from 3:19 to 4:31
7          to complete conference call.)
8  Q    (BY MR. KATZ): I think we were going to look
9  and see where Officer Dahl was when the dog was
10  released.
11  A    That's what it was.
12  Q    Okay.  Let's see if we can get this back up.
13    (Video playing.)
14  Q    (BY MR. KATZ): Did that help refresh your
15  recollection?
16  A    It does, but it doesn't really clarify a whole
17  bunch because of the distance of the video, itself.  So
18  you are asking me did he deploy it right at the fence,
19  itself.  And, you know, looking at the individual, it's
20  really hard to tell, but he wasn't standing right at the
21  fence.  But I am looking at his report talking about a
22  cyclone fence, also.  So I don't know what he was able
23  to view and what he wasn't able to view.
24  Q    And is that because of the limitations that you
25  find in looking at the FLIR video?

71

PAGE 72

1  A    Yes.
2  Q    Now, on this same paragraph, there is the
3  statement, "Canine Bandit located Garcia, believing he
4  was the suspect, and correctly apprehended by biting
5  him."
6  A    Correct.
7  Q    So is it your understanding that the dog
8  believed that Garcia was the suspect?
9  A    I don't know what the dog believed.  I mean, the
10  dog is guided by the handler.  So I think better form
11  that Officer Dahl believed that was the suspect back
12  there.
13  Q    Okay.  Now, when you received this report, you
14  read Sergeant Oliveira is the one that also believed
15  that had Officer Dahl seen Garcia, based on the info he
16  had at the time, he would have deployed canine Bandit to
17  apprehend him believing he was the suspect?
18  A    Correct.
19  Q    And so we are clear, do you believe that if
20  Officer Dahl had visual contact with Mr. Garcia in the
21  backyard, he would have been -- it would have been
22  appropriate for him to send the dog on a direct send to
23  bite Mr. Garcia?
24  A    Based on what -- or rephrase that, because you
25  threw Mr. Garcia versus apprehend what he thought was

72

PAGE 73

1  the suspect.  And I think we are talking two different
2  things.
3  Q    In the canine parlance, apprehend is a euphonism
4  for bite, correct?
5  A    Yes.
6  Q    Okay.  And if you see someone and deployed the
7  dog on a direct -- that would be called a direct send,
8  correct?
9  A    That's correct.
10  Q    Okay.  So when Officer Oliveira wrote, "I also
11  believe that had Officer Dahl seen Garcia, based on the
12  info he had at the time, he would have deployed canine
13  Bandit to apprehend him, believing he was a suspect."
14  What did you interpret that sentence to mean?
15  A    I interpreted that to mean that if Officer Dahl
16  would have seen the suspect, not Garcia, but the person
17  standing there, he would have had reason to believe that
18  it was the suspect that was fleeing from the pursuit to
19  begin with, because we had no other reason to believe
20  there was anybody else in the backyard.
21       So in his mind, one person -- one person came
22  off of the roof.  One person is in the backyard.  It is
23  one and the same, the suspect.
24  Q    So he told you that -- so he expressed his
25  belief that it would have been appropriate to send the

73

Garcia v. City of Sacramento   January 31, 2012   Lt. DAVE PELETTA

SHEET 20   PAGE 74

PAGE 74

1  dog after a -- if there was a single person in the
2  backyard, it would have been appropriate to send the dog
3  to apprehend that person?
4  A    Based on how this unfolded, with the suspect
5  coming off of the roof and the real time that we were
6  receiving information and the time that it took the
7  canine to get there, yes.
8  Q    And would your understanding that would have
9  been without any subsequent warnings, as well?
10      MS. CHAPMAN: Objection. Vague and ambiguous.
11  A    I once again base it on the behavior that this
12  person is not stopping. He is continuing to run. He
13  tried to conceal himself on the roof of a house. Yes,
14  no additional warnings at that point.
15  Q    (BY MR. KATZ): Okay. Now, in this memorandum
16  from Sergeant Oliveira, is there -- does he indicate how
17  many other people were in the backyard?
18  A    I don't remember reviewing that in this memo.
19  But let me look it over real quick to make sure.
20  Q    Sure.
21  A    Not that I see immediately here.
22  Q    Now, Sergeant Oliveira told you it appeared to
23  him that Garcia may have communicated with the suspect
24  briefly?
25      MS. CHAPMAN: Objection. Are you asking if that

74

PAGE 75

1  is what was in this memorandum or a separate
2  conversation?
3  A    That's all I can testify to, what is in the
4  memorandum.
5  Q    (BY MR. KATZ): Okay. Did you ask Sergeant
6  Oliveira what the basis for that belief was?
7  A    I don't remember if we had that conversation or
8  not.
9  Q    When you observed the video, do you believe that
10  you were able to determine if there was any
11  communication between Mr. Garcia and the suspect?
12  A    It's impossible for me to tell from the FLIR
13  video.
14  Q    Okay. Now, in the last paragraph of this
15  memorandum, which is page two of Exhibit 32, Sergeant
16  Oliveira wrote, "Based on my review of the
17  aforementioned facts, it is my opinion that Officer Dahl
18  did everything reasonably expected to safely deploy
19  canine Bandit without endangering himself or the cover
20  officers any further;" is that correct?
21  A    Yes.
22  Q    And that included not giving any warnings before
23  deploying the dog into the backyard of 442 Potomac,
24  correct?
25      MS. CHAPMAN: Objection, calls for speculation.

75

PAGE 76

1  A    No, additional warnings.
2  Q    (BY MR. KATZ): Okay. Now, Sergeant Oliveira
3  claimed that, "Officer Hutchins advised me that --"
4  advised me, being Sergeant Oliveira -- "that it was
5  standard for them to warn canine officers of any persons
6  or animals in the perimeter for officer safety purposes?
7  A    That's what the memo says.
8  Q    Okay. Sir, didn't you testify that it was known
9  standard procedure for that to happen?
10      MS. CHAPMAN: Objection, vague and ambiguous.
11  Q    (BY MR. KATZ): Do you understand the question?
12  A    I do, but you are asking me two different
13  things. You are asking me if that's what he said --
14  Sergeant Hutchins said to Oliveira, and I can only tell
15  you what he wrote. So I assume that communication
16  occurred. But, yes, on my previous testimony, that is
17  standard practice that when the helicopter is deployed
18  and there are multiple hot spots in an area, the
19  observer broadcasts that information so we have it.
20  Q    And whose decision is it ultimately to deploy a
21  canine?
22  A    Well, it could be the canine handler's.
23  Ultimately, it falls on the sergeant. But a watch
24  commander can also deploy a canine, so we have three
25  variables there.

76

PAGE 77

1  Q    In this instance, who was that it made the
2  decision to deploy the dog?
3  A    Sergeant Hinz.
4  Q    So it was Sergeant Hinz's decision to deploy the
5  dog in the backyard of 442 Potomac?
6  A    Sergeant Hinz authorized the initial deployment
7  to search for the suspect, which includes any other
8  subsequent properties that happen. And when you are
9  talking of fast-breaking situations like we are dealing
10  with on Potomac, doesn't need additional supervisor
11  approval.
12  Q    And how fast-breaking was the situation?
13  A    Well, the information, as you have listened to
14  it, is unfolding fairly quickly when it comes to police
15  work and especially when a suspect is continuing to
16  escape.
17  Q    Well, the video does speak for itself, so let's
18  not get into an argument about that.
19      Now, you indicated that you are familiar with
20  this form of a -- what is called an accidental bite
21  memorandum. Is what you would call it? What would you
22  call it?
23  A    Accidental bite memorandum is fine.
24  Q    Is there anything else that you would call it?
25  A    No.

77

Garcia v. City of Sacramento    January 31, 2012    Lt. DAVE PELETTA

SHEET 21  PAGE 78

1  Q    And are those maintained by the sheriff's
2  department -- the police department?
3  A    Yes.
4  Q    And how are they maintained by the police
5  department?
6  A    In an electronic file.
7  Q    And how would one locate that on an electronic
8  file? You mean in a computer, but --
9  A    It's in a computer through the canine office,
10  itself.
11  Q    Okay. I guess what I am asking is are there --
12  is there a separate folder or link to accidental bite
13  memorandums?
14    MS. CHAPMAN: Objection. Lacks foundation,
15  calls for speculation. You can answer if you know.
16  A    I don't recall if it's separate to their own as
17  much as it is under just accidental with some of the
18  other reviews that we would do. I don't know if it's
19  any specific folder or not. But there is a file
20  electronically filed within a canine folder that covers
21  this. But I don't know what else is included in there.
22  I just can't remember.
23  Q    Okay. And how many of these accidental bite
24  memorandums do you recall seeing?
25  A    My testimony said earlier, I think it was six to

78

PAGE 79

1  eight that I have been there and then an additional
2  three for people that -- that chose not to have a
3  settlement agreement. So ten, 12, somewhere in there.
4  Q    Okay. Now, are you familiar with what are
5  called -- or were -- canine apprehension reports?
6  A    Yes. I think that we went over that the last
7  time I was here.
8  Q    We did. Just in a different capacity.
9  A    I understand.
10  Q    It is a little odd to have someone wear multiple
11  hats, if you will. But that's the way it goes.
12    I want to show you for point of reference
13  Exhibit 31 previously marked. Now, Lieutenant, is it
14  correct that roughly July '08, they stopped using these
15  forms?
16  A    I don't know about when, but I know it was '08
17  sometime.
18  Q    Roughly mid year?
19  A    Yes.
20  Q    When these forms were used, would you receive a
21  copy of those forms?
22  A    Yes.
23  Q    Okay. Now, after those forms were used -- I'm
24  sorry, what was -- let me just pretend that question --
25  so you received copy of those forms. What was the

79

PAGE 80

1  purpose of you receiving a copy of those forms?
2  A    Just to review it, to review -- excuse me --
3  review the apprehension again. But at some point, I
4  didn't want to see them anymore.
5  Q    Okay. And in addition to the apprehension
6  reviews, would you have any documents attached to those?
7  A    In some cases, yeah, the crime report would
8  support it, red border forms or some of the internal
9  forms that would go with the liability of a bite. So,
10  yes.
11  Q    What about photographs?
12  A    No.
13  Q    Never?
14  A    I'm not going to say never, but nothing -- it
15  wasn't a routine to see photographs.
16  Q    Do you ever recall seeing photographs attached
17  to a canine apprehension review?
18  A    I can't think of a specific instance.
19  Q    Okay. Do you have a general recollection of any
20  specific incident receiving photographs?
21  A    No.
22  Q    Okay. Now, following the use of red border
23  forms for a period of --
24    (Deposition interrupted.)
25  Q    (BY MR. KATZ): Okay. Now, my understanding is,

80

PAGE 81

1  Lieutenant, that following the use of the canine
2  apprehension forms, there started to be an annotation on
3  the KATS form; is that correct?
4  A    Yes.
5  Q    K-A-T-S?
6  A    Correct.
7  Q    And that was a data base that was utilized by
8  the department for a period of time?
9  A    Store-bought software program that tracked
10  pretty much the same thing that our apprehensions did
11  and more.
12  Q    Okay. Would you receive copies of the KATS
13  incident detail reports?
14  A    No.
15  Q    Okay. Would you regularly review those?
16  A    Well, it's a two-sided question, because, one, I
17  didn't receive physical reports, because I could access
18  the software program. But, two, the information that I
19  would see in there is redundant through a use-of-force
20  report/blue team report. So I would be reviewing it
21  twice and seeing the exact same thing.
22  Q    So you did not look at the -- it was certainly
23  not your practice to review the incident details from a
24  KATS form, correct?
25  A    Not unless I -- something flagged me on a use of

81

Garcia v. City of Sacramento   January 31, 2012   Lt. DAVE PELETTA

SHEET 23   PAGE 86

PAGE 86

1 encompass?
2    MS. CHAPMAN: I'm going to object, first, on the
3 grounds of relevance. Second, the general order
4 pertaining to CEDs is confidential official information.
5    MR. KATZ: Are you directing him not to answer?
6    MS. CHAPMAN: Well, let's talk about that. At
7 least, this will be subject to protective order if he
8 does discuss it. But my bigger concern is relevance.
9    MR. KATZ: Relevance is the guidelines as
10 provided for some use of forces versus others.
11    MS. CHAPMAN: So you are wanting to know the
12 actual substance of the general order?
13 Q    (BY MR. KATZ): I can tie one I have. There is
14 a carotid manual, correct, or order, regarding carotid
15 holds?
16 A    Yes.
17 Q    And the carotid holds, it sets forth
18 circumstances when a carotid hold is appropriate,
19 correct?
20 A    Yes.
21 Q    And when you shouldn't use a carotid hold,
22 correct?
23 A    Yes.
24 Q    And it specifically warns about the dangers of a
25 carotid hold, correct?

86

PAGE 88

1 a ledge, but it doesn't say don't do it. It talks about
2 considerations when you are using the device.
3 Q    Okay. Talks about considerations?
4 A    Correct.
5 Q    About the dangers posed by someone operating
6 equipment when they are shot with a CED?
7 A    Operating equipment? I'm not sure --
8 Q    Car, power tool?
9 A    It's not addressed in there.
10 Q    Really?
11 A    No. I mean, at some point, common sense has to
12 set in. But it's not addressed in our policy.
13 Q    Okay. In terms of the policy regarding
14 impact -- impact weapons --
15 A    Yes.
16 Q    -- are there discussions about -- in the policy,
17 does it address the dangers of using an impact weapon on
18 someone -- on certain portions of a person's body?
19 A    Correct. There are specific target areas that
20 we try to stay away from.
21 Q    Okay. And does the policy -- and by policy, I
22 mean to include the operations order -- indicate why?
23 A    Without reviewing it, I am sure it addresses it
24 at some point. But I couldn't tell you specifically.
25 Q    So without asking for specifics, but general

88

PAGE 87

1 A    Yes.
2 Q    Okay. And for the use of less lethal rounds, it
3 specifically advises officers of the dangers, correct?
4 A    Yes.
5 Q    As does the CED order?
6 A    Yes.
7 Q    As does the chemical weapons or agents order,
8 correct?
9 A    Yes.
10 Q    Okay. The canine officer doesn't address the
11 risks posed by canine bites, does it?
12    MS. CHAPMAN: Objection. Vague and ambiguous.
13 You mean the canine policy?
14 Q    (BY MR. KATZ): The canine policy, which is in
15 an operations order, does not address the risks posed
16 through canine bites, correct?
17 A    Risks to what or whom?
18 Q    To people being bit.
19 A    More specifically?
20 Q    Well, for example, in the CED or conductive
21 energy device manual, they warn about adverse
22 consequences potentially of applying that type of
23 weapon, correct?
24 A    No. They talk about special considerations when
25 deploying it, i.e., don't deploy it when somebody is on

87

PAGE 89

1 understanding, is it advises officers that it's really
2 dangerous to hit someone, for example, on the neck with
3 an impact device, correct?
4 A    Yes.
5 Q    In the head?
6 A    Yes. We just call them nontarget areas.
7 Q    Okay. There is not a similar qualification or
8 admonition regarding the deployment of a dog, is there?
9    MS. CHAPMAN: Objection. Argumentative. The
10 document speaks for itself.
11 A    There is considerations for deploying canines
12 just like there is considerations for deploying any
13 other less lethal weapon. So there are considerations
14 on the second paragraph of it, I think it is.
15 Q    Okay. But there are no specific factors
16 indicating the consequences of a canine bite
17 potentially, correct?
18    MS. CHAPMAN: Same objection.
19 A    I don't really understand your question when you
20 keep saying that. So, no, I don't know the answer to
21 that.
22 Q    (BY MR. KATZ): Okay. So in your -- for
23 example, controlled energy devices, does the
24 department's policy address the danger posed in using
25 that device against someone with a pacemaker?

89

Garcia v. City of Sacramento    January 31, 2012    Lt. DAVE PELETTA

PAGE 90

1  A    It's a consideration, yes.
2  Q    Okay. And when you say it's a consideration,
3  what do you mean by a consideration, just so we are
4  clear?
5  A    All of the things are -- we take the facts and
6  the circumstances of the totality of the circumstances
7  when we are talking about these policies. Just like
8  when we use the less lethal rounds, we try not to aim a
9  person's head. But when we are deploying it, all of a
10  sudden they move and they get hit in the head, we have
11  no control over things like that.
12     So now all of a sudden are you saying that we
13  are out of policy because things happened out of our
14  control? A lot of what you are also talking about may
15  not be documented but also could be potentially covered
16  in the training block that is presented to the officers
17  when they receive the specifics on whatever it is you
18  are referring to.
19  Q    Okay. Well, your understanding as supervisor of
20  the canine unit, do you have an understanding as to
21  whether or not the dogs target or pick out any
22  particular portion of a person's anatomy to bite?
23  A    No.
24  Q    And is it correct the dogs aren't trained to
25  bite hard or less hard?

90

PAGE 91

1  A    No, no. That's not true.
2  Q    And maybe I have a double negative. Let me
3  just -- are the dogs trained to bite with varying
4  degrees of force?
5  A    No.
6  Q    For the dogs, a bite is a bite?
7  A    Correct.
8  Q    Are the dogs trained to differentiate between
9  adults and children, to the best of your understanding?
10  A    No.
11  Q    Men and women?
12  A    No.
13  Q    Mentally ill from mentally competent
14  individuals?
15  A    No.
16  Q    People with developmental disabilities from
17  those without developmental disabilities?
18  A    No.
19  Q    Old people on the basis of their age?
20  A    No.
21  Q    Have you ever reviewed any medical studies on
22  injuries resulting from police canine bites?
23     MS. CHAPMAN: Objection. Vague and ambiguous.
24  Do you mean medical records or actual --
25     MR. KATZ: Studies.

91

PAGE 92

1     MS. CHAPMAN: If you know what that is.
2  A    No, I don't know what that is.
3  Q    (BY MR. KATZ): Okay. Have you ever read any
4  articles or been to any training that there was a
5  presentation discussing the consequence of police canine
6  bites?
7     MS. CHAPMAN: Still object on the grounds it's
8  vague and ambiguous. But if you understand, go ahead.
9  A    I have attended training with regards to police
10  canine, yes. I'm not sure what the second part of your
11  question means though.
12  Q    (BY MR. KATZ): Okay. Was there ever any
13  discussion about the type of injuries that are inflicted
14  by the dogs?
15  A    Like a bite?
16  Q    Yes.
17  A    Is what you are referring to? Yes.
18  Q    What training regarding the amount of injury
19  inflicted by the bite was discussed at any training you
20  attended?
21     MS. CHAPMAN: Objection. Vague and ambiguous.
22  Unintelligible as phrased.
23  Q    (BY MR. KATZ): Do you understand the question?
24  A    I really don't.
25  Q    Okay. You have attended training in which bites

92

PAGE 93

1  are discussed?
2  A    As part of the topics, yes.
3  Q    And did any of those topics include the physical
4  injuries sustained on the individuals being bitten?
5  A    Nothing that comes to mind, no.
6  Q    Okay. Have you ever -- now, Sergeant Oliveira
7  has been the head of the canine unit the entire time you
8  have been there?
9  A    That's correct.
10  Q    And was your practice to review apprehension
11  reports?
12  A    Yes.
13  Q    With Sergeant Oliveira?
14  A    Not with him. Independent of him, but yes.
15  Q    So after you had reviewed them, you would
16  occasionally discuss particular apprehension reports
17  with him if you felt it was appropriate?
18  A    Yes.
19  Q    On any of those instances, have you ever
20  reviewed the medical records of the person being
21  bitten -- who was bitten?
22  A    Medical records, no.
23  Q    Okay. Have you ever reviewed the photographs of
24  the person who was bitten with Sergeant Oliveira?
25  A    I have seen canine bites and their photographs

93

Exhibit M

1                    UNITED STATES DISTRICT COURT

2          IN AND FOR THE EASTERN DISTRICT OF CALIFORNIA

3

4     JAMES GARCIA,                    )
                                       )
5                     Plaintiff,       )
                                       )
6          -vs-                        ) No. 2:10-CV-00826
                                       )      JAM-KJN
7     CITY OF SACRAMENTO; City of      )
      Sacramento Chief of Police       )
8     RICHARD BRAZIEL (Badge #5030);   )
      City of Sacramento Police        )
9     Officer GARY DAHL (Badge #0672);)
      and DOES  I through XX,          )
10    inclusive,                       )
                                       )
11                    Defendants.  )
                                       )

12

13

14                       Deposition of

15                     WILLIAM PRUITT

16             THURSDAY, DECEMBER 29, 2011

17

18

19

20

21
      REPORTED BY:   CATHERINE RANSOM, CSR No. 4693
22    _____

23             SCRIBE REPORTING & LEGAL COPYING
                   Certified Shorthand Reporters
24             2315 Capitol Avenue, Suite 1010
                    Sacramento, CA  95816
25
      FAX 916-492-1222     877-453-1010      916-492-1010

                                                              1

Garcia v. City of Sacramento         December 29, 2011         WILLIAM PRUITT

SHEET 8   PAGE 26

**PAGE 26**

1  Q    And at some point in time, did you go outside
2  your residence?
3  A    Yes.
4  Q    When did you do that?
5  A    When I seen a young man jump over my neighbor's
6  fence.
7  Q    Okay.
8  A    And then jumped over my gate right in front of
9  the house. I just happened to look up out of the window
10  and seen him going through there.
11  Q    And -- okay. Go ahead.
12  A    Okay. And that was when I run out to the
13  backyard to see what was going on.
14  Q    Okay. Your front yard back in April of 2009,
15  was it gated?
16  A    Yes.
17  Q    Okay. Chain-link-type fence?
18  A    Yes, it is.
19  Q    And do you recall what types of vehicles were
20  parked at your residence on this particular day?
21  A    Our Pontiac was. That's about all that was
22  there.
23  Q    Okay.
24  A    Pontiac Montana it was.
25  Q    Okay. What about any sort of a white van. Do

**PAGE 27**

1  you know if there was a white van parked at your
2  residence?
3  A    That was our car. It was white.
4  Q    And where was that parked?
5  A    Right in front of the house, right in the
6  driveway.
7  Q    And would that be under a carport or --
8  A    Yes. It's a little carport, yes.
9  Q    So this man that you saw -- you said you saw a
10  man running through your neighbor's yard; is that
11  correct?
12  A    Yes. And then he jumped over our fence.
13  Q    Into your front yard?
14  A    Yes. And he run right past the front window. I
15  opened up the door and seen him running. And then he
16  jumped over my fence. He didn't even open the door.
17  Q    Wow. So he jumped over your fence twice, once
18  to get in and once to get out?
19  A    Yes. And then he run to the backyard.
20  Q    Do you remember any sort of physical
21  description, what he looked like?
22  A    I have no idea.
23  Q    Okay. Did you recognize him?
24  A    No.
25  Q    Okay. And do you know the address of your

**PAGE 28**

1  neighbor that you saw -- that neighbor's address where
2  you saw him run through their front yard, as well?
3  A    Do I know their address?
4  Q    Yes.
5  A    415? No, wait, wait. 43, 44?
6  Q    Something like that?
7  A    Yes.
8  Q    Can you describe if you are sitting facing your
9  window looking down the street?
10  A    He's right nextdoor.
11  Q    On the right?
12  A    On the right. Looking out that house, it would
13  be on the right.
14  Q    Okay. And you said at some point you opened up
15  your front door and went outside?
16  A    Yes, I went to see what was going on.
17  Q    And where was that person when you --
18  A    He just jumped over the fence, over my fence.
19  Q    Okay. To the side of your house?
20  A    Yes.
21  Q    Okay. Did he say anything to you?
22  A    Not a word.
23  Q    Did you say anything to him?
24  A    No.
25  Q    Did you see anything or anyone else out in front

**PAGE 29**

1  of your residence at that time?
2  A    No, I didn't, not at that time.
3  Q    Did you see any police cars?
4  A    Yes. They started up the street.
5  Q    Did you hear any police cars?
6  A    No, they didn't have any sirens on.
7  Q    And when you were outside, did you hear any
8  announcements at all from the helicopter or police
9  officer?
10  A    No, the helicopter didn't. But I ran out the
11  back door and the police officer -- they had everybody
12  in the backyard and hollered for everyone to get down on
13  the ground so --
14  Q    Okay.
15  A    And the --
16  Q    Go ahead.
17  A    Told the wife to get down, and she had to lay
18  down face down on the ground too.
19  Q    Okay.
20  A    And me, they told me to sit down on this -- on
21  the porch and the steps.
22  Q    Okay. And that would be in your backyard?
23  A    Yes.
24  Q    While you were still out front, how long would
25  you say you were out front before you went to the

Exhibit N

```
 1              IN THE UNITED STATES DISTRICT COURT

 2         IN AND FOR THE EASTERN DISTRICT OF CALIFORNIA

 3

 4    JAMES GARCIA,                   )
                                      )
 5                   Plaintiff,       )
                                      )
 6         -vs-                       ) No. 2:10-CV-00826
                                      )     JAM-KJN
 7    CITY OF SACRAMENTO; City of     )
      Sacramento Chief of Police      )
 8    RICHARD BRAZIEL (Badge #5030);  )
      City of Sacramento Police       )
 9    Officer GARY DAHL (Badge #0672;)
      and DOES I through XX,          )
10    inclusive,                      )
                                      )
11                   Defendants.      )
      _____)

12

13

14                  Deposition of

15             OFFICER ROSALIA CABRERA

16           Thursday, February 9, 2012

17

18

19

20

21    REPORTED BY:   CATHERINE RANSOM, CSR No. 4693

22
                  SCRIBE REPORTING & LEGAL COPYING
23                Certified Shorthand Reporters
                  2315 Capitol Avenue, Suite 1010
24                    Sacramento, CA  95816

25    FAX 916-492-1222      877-453-1010      916-492-1010
```

1

Garcia v. City of Sacramento    February 9, 2012    OFFICER ROSALIA CABRERA

SHEET 12  PAGE 42

**PAGE 42**

1  to deal with the other people that were there.
2  Q    Okay. Were you surprised the dog had bitten
3  someone?
4  A    No.
5  Q    Why not?
6  A    Because of the actions that the subject was
7  having and as far as him matching the description of the
8  suspect and getting the information we had at the time
9  from Air 1 that someone had been seen running into the
10  backyard.
11  Q    Okay. Had you seen anyone run into the backyard
12  at 442 Potomac?
13  A    No.
14  Q    Had you seen anyone walk into the backyard at
15  442 Potomac other than Officer Dahl?
16  A    No.
17  Q    I don't have any other questions. Thank you.
18        EXAMINATION BY MS. CHAPMAN
19  Q    I just have one quick follow-up question. The
20  announcements you heard from the helicopter the night of
21  this incident, did that include any announcements
22  pertaining to the use of a canine?
23  A    Yes.
24  Q    Okay. And what do you recall, not verbatim, but
25  what was the general nature of what you recall?

42

**PAGE 43**

1  A    The general nature was, you know, police are out
2  looking for a suspect. Go back into your homes. The
3  canine would be deployed. Go back into your residence.
4        MS. CHAPMAN: Okay. Thank you.
5        EXAMINATION BY MR. KATZ
6  Q    Okay, ma'am. So you're testifying to this under
7  oath. Did you report that in your report anywhere?
8  A    No, I did not.
9  Q    Did you hear on the tape any indication that the
10  canine officer had given any -- sorry -- the helicopter
11  unit over 442 Potomac had given any advisements
12  regarding a canine?
13  A    No, but prior to that, yes.
14  Q    And where were you when you heard that
15  announcement?
16  A    I was in the area and then setting up on the
17  perimeter spot I was at.
18  Q    What street were you on?
19  A    I was coming down Northgate.
20  Q    How far is Northgate from 442 Potomac where you
21  were?
22  A    Northgate -- Potomac runs east and west, I
23  believe, from Northgate. So I was on the east side of
24  Northgate.
25  Q    How many blocks?

43

**PAGE 44**

1  A    Well, Potomac comes off of Northgate.
2        MS. CHAPMAN: I think the question is: How many
3  blocks away from Potomac were you when you heard those
4  announcements?
5  A    Oh, well, let's see. I was coming northbound on
6  Northgate, Bowman, from the original location of where
7  the pursuit had ended. And then I believe it's two
8  streets up on Potomac.
9  Q    (BY MR. KATZ): And were you on Northgate?
10  A    Yes.
11  Q    Northgate and Bowman, roughly?
12  A    Yes.
13  Q    Did anyone at 442 Potomac ever tell you or did
14  you hear anyone say they had heard a canine advisement
15  prior to Mr. Garcia being bitten?
16  A    I didn't -- the one person that I spoke with,
17  did not ask them specifically that question.
18  Q    And your report that you prepared, did you
19  indicate whether or not you had heard a canine
20  advisement?
21        MS. CHAPMAN: Objection. Asked and answered.
22        MR. KATZ: That's nice, but since we have your
23  question and new testimony, I going to ask the question
24  again.
25        MS. CHAPMAN: This is not new testimony. I

44

**PAGE 45**

1  asked a question. She has -- wait. I need to finish
2  what I am saying.
3        MR. KATZ: Go ahead.
4        MS. CHAPMAN: You have asked her that question
5  after she answered my question. She has already
6  answered that question to you after she testified what
7  she had heard in the announcement.
8        MR. KATZ: Let's have this marked if we haven't.
9        (Whereupon the court reporter marked
10        Exhibit 90.)
11        MS. CHAPMAN: For the record, Exhibit 90 appears
12  to be casualty report for 107600, and it is authored by
13  the witness.
14  Q    (BY MR. KATZ): Okay. Why don't I ask you.
15  Exhibit 90 is two-page document, ma'am?
16  A    Yes.
17  Q    Okay. And is this a two-page document entitled
18  observations?
19  A    Yes.
20  Q    Are you the author of those?
21  A    Yes.
22  Q    And did you prepare those close in time to the
23  incident?
24  A    Yes.
25  Q    Okay. And did you try to include the

45

Garcia v. City of Sacramento   February 9, 2012   OFFICER ROSALIA CABRERA

SHEET 13  PAGE 46

PAGE 46

1 information that you believed to be significant?
2      MS. CHAPMAN: Objection. Vague and ambiguous.
3 A    I attempted -- this is a summary of my
4 observations at the time.
5 Q    (BY MR. KATZ): Okay. And did you record any
6 observations about you hearing any canine announcement?
7      MS. CHAPMAN: Objection, asked and answered.
8 You can still answer the question.
9 A    I did not record that specifically in my
10 observations. But then again, these observation are
11 only -- you know, I don't put everything that is done or
12 heard, because it's a recollection.
13 Q    (BY MR. KATZ): Well, this incident was
14 approximately two-and-a-half years ago.
15 A    Yes.
16 Q    Okay. Was your memory fresher in time when you
17 prepared this document than when you came in here today?
18 A    Yes.
19 Q    Directing your attention to what's been marked
20 as Exhibit 12 previously. Have you ever seen Exhibit 12
21 before?
22 A    Yes.
23 Q    Okay. Was Exhibit 12 the use of canines policy
24 in effect at the time of this incident?
25      (MS. CHAPMAN): Objection, calls for speculation,

46

PAGE 48

1 you understand what I am talking about?
2 A    Yes.
3 Q    And calls that you prepared portions of two
4 reports in connection with.
5 A    Yes.
6 Q    When you were on that call, did you ever hear on
7 your radio Officer Dahl advising dispatch that he had
8 given a canine warning?
9 A    A canine warning to the incident to the rear of
10 the residence or prior?
11 Q    To anyone, prior, any time.
12 A    I don't recall specifically.
13 Q    Do you have a general recollection of that
14 happening?
15 A    I don't remember.
16 Q    Okay. Do you have any recollection of Air 1
17 advising that they had given a canine warning to
18 dispatch?
19 A    Yes. When they made their announcements.
20 Q    So you heard that on your channel one radio you
21 are telling us?
22      MS. CHAPMAN: I'm going to object to the
23 question, that that's vague and ambiguous. The question
24 that was asked if you recall hearing Air 1 tell dispatch
25 they had given an announcement, not if you heard Air 1

48

PAGE 47

1 lacks foundation. You can answer if you know.
2 A    I don't know.
3 Q    (BY MR. KATZ): You indicated that you have seen
4 Exhibit 12 before. How is it that you have seen
5 Exhibit 12 before?
6 A    I have seen a copy of it, but I don't know if
7 this is a current copy of it that's current right now.
8 Q    Okay. When you say you saw a copy before,
9 when -- in what context or how was it you had seen a
10 copy of this before?
11 A    In just my training of reviewing general orders.
12 Q    Okay. Did you ever hear -- and when you were
13 out on the scene on Potomac the evening of this
14 incident, did you have any type of audio communications
15 with the dispatch?
16 A    Radio communication, yes.
17 Q    You were on channel one?
18 A    Yes.
19 Q    Did you ever hear Officer Dahl advise
20 communications that he had given a canine announcement?
21      MS. CHAPMAN: Objection, vague and ambiguous as
22 to communication. Do you mean dispatch?
23 Q    (BY MR. KATZ): When you were on -- when you
24 responded to the call that -- the call, I mean the
25 incident that brought you eventually to 442 Potomac. Do

47

PAGE 49

1 give the announcement.
2 A    So if Air 1 had told dispatch that they had
3 given an announcement?
4      MS. CHAPMAN: Yes, that was the question he
5 asked.
6 A    Yes.
7 Q    (BY MR. KATZ): You heard that?
8 A    Over the radio, yes.
9 Q    So you heard that, that Air 1 said we are giving
10 a canine announcement?
11 A    Yes. And then also in addition to what we do on
12 the ground -- and that wasn't me specifically, but we
13 also confirm that the announcements are loud and clear
14 on the ground.
15 Q    And did you hear Officer Dahl ever communicate
16 with Air 1 regarding canine announcements?
17 A    I don't recall.
18 Q    Did you ever give a canine announcement?
19 A    That's not my duty.
20 Q    Who's job is it?
21      MS. CHAPMAN: Objection. Calls for speculation,
22 lacks foundation. You can still answer.
23 A    The canine handler's job.
24 Q    (BY MR. KATZ): Did you ever hear Officer Dahl
25 give a canine announcement that evening?

49

Exhibit O

SHEET 1   PAGE 1

1              IN THE UNITED STATES DISTRICT COURT

2         IN AND FOR THE EASTERN DISTRICT OF CALIFORNIA

3

4    JAMES GARCIA,                    )
                                      )
5                   Plaintiff,        )
                                      )
6         -vs-                        ) No. 2:10-CV-00826
                                      )    JAM-KJN
7    CITY OF SACRAMENTO; City of      )
     Sacramento Chief of Police       )
8    RICHARD BRAZIEL (Badge #5030);   )
     City of Sacramento Police        )
9    Officer GARY DAHL (Badge #0672); )
     and DOES I through XX,           )
10   inclusive,                       )
                                      )
11                   Defendants.      )
     _____)

12

13

14                    Deposition of

15             SERGEANT STEVE OLIVEIRA

16                     VOLUME I

17             MONDAY, JANUARY 23, 2012

18

19

20

21   REPORTED BY:   CATHERINE RANSOM, CSR No. 4693

22   _____
                SCRIBE REPORTING & LEGAL COPYING
23              Certified Shorthand Reporters
                2315 Capitol Avenue, Suite 1010
24                 Sacramento, CA  95816

25   FAX 916-492-1222      877-453-1010      916-492-1010

                                                    1

Garcia v. City of Sacramento   January 23, 2012   STEVE OLIVERIA, Sgt. - Vol. 1

SHEET 4   PAGE 10

PAGE 10

1    possible sense. I mean written documents, notes,
2    computer data bases, PDF files, photographs, video,
3    audio recordings, charts. Have you reviewed anything in
4    preparation for this deposition?
5    A    Yes.
6    Q    And what materials have you reviewed?
7    A    I reviewed the report. I reviewed the
8    helicopter surveillance video. Ms. Chapman, I met her
9    at her office one day and reviewed that. That was
10   several weeks ago.
11   Q    Okay.
12   A    What else? My review of the incident. And I
13   believe that's pretty much it.
14   Q    Okay. And when you say the report, do you know
15   what documents you are referring to?
16   A    It was the information, the incident report that
17   was filed by Officer Dahl and the other officers that
18   were on scene.
19   Q    Okay.
20   A    I don't recall the case number, but it was
21   regarding the incident where Mr. Garcia was bitten.
22   Q    Okay. Tell you what. Let me show you a couple
23   of reports and tell me if these are the ones or one you
24   reviewed just because we have those in different formats
25   or whatnot. Let's look at those.

10

PAGE 11

1         First, show you Exhibit 14.
2    A    Looks like the report I am referring to.
3    Q    Okay. And let me show you 15. Do you see if
4    this is a report you looked at please.
5    A    I didn't look at this report number. A lot of
6    it seems like the same from this report number. But for
7    some reason, I didn't review that one. I'm not sure
8    what --
9         MS. CHAPMAN: Did you want the witness to review
10   that exhibit?
11        MR. KATZ: I just want to know which ones he
12   reviewed.
13   A    I reviewed case number 2009-107600. That's the
14   one I looked at. This one -- I'm not sure if they did
15   two separate reports.
16   Q    (BY MR. KATZ): You so didn't review 15,
17   correct?
18   A    I did not review 107560 is the case number.
19   Q    And the other one is just another printed
20   version of that. So that's fine. And you also
21   indicated that you reviewed -- by your report, by that,
22   do you mean your two-page administrative review?
23   A    Correct.
24   Q    Let me ask you this. Was it a two-page
25   administrative review?

11

PAGE 12

1    A    I don't recall. I think it was two pages. I
2    would have to look at it and be sure. It's probably
3    titled accidental bite review, case number attached.
4    Q    Let me show you what has -- hasn't been
5    previously marked. Let's have this marked as your next
6    exhibit, which will be number 32.
7         (Whereupon the court reporter marked
8         Exhibit 32.)
9    Q    (BY MR. KATZ): Is that the document you are
10   referring to?
11   A    Yes.
12   Q    Okay. And when you referred to the video, was
13   that the infra-red helicopter video?
14   A    The FLIR, yes.
15   Q    Okay. Did you do it with or without sound?
16   A    I think there was no sound. I don't remember if
17   the sound was working or not.
18   Q    Okay. In your review of your memo, the report
19   and the video, was there anything that struck you as
20   being wrong or incorrect as you read it or reviewed it?
21   A    My review of it?
22   Q    Yes.
23   A    I did notice the times I put that Officer Dahl
24   responded at 2204 hours, and I notice from reviewing the
25   report that he had put that time. That's probably where

12

PAGE 13

1    I got it from. But actually happened earlier in the
2    evening, closer to 8:00 p.m. Other than that, no, that
3    was it.
4    Q    All right. Now, apart from your attorney or
5    anyone in the attorney's office, did you discuss the
6    fact that you were being deposed with any other person
7    or persons?
8    A    I had discussed it with my boss, Lieutenant
9    Peletta.
10   Q    And what did you discuss with Lieutenant Peletta
11   regarding this?
12   A    That I had my deposition today, scheduled for
13   today. I was going to testify. I was aware that he has
14   already come in to testify. I know that he covered --
15   basically, he was asked questions about the policies is
16   the main part of his testimony. That's pretty much what
17   we talked about.
18   Q    So you did have some discussion with Lieutenant
19   Peletta about what the testimony would be, what he
20   testified about?
21   A    Yeah. The subjects of what he testified to,
22   yes.
23   Q    Any other discussions with him about the
24   deposition?
25   A    That was pretty much it.

13

Garcia v. City of Sacramento  January 23, 2012  STEVE OLIVERIA, Sgt. - Vol. 1

SHEET 6  PAGE 18

PAGE 18

```
1  A    Yes.
2  Q    And what does call-off mean?
3  A    Call-off or running call-off is what we call it
4  if the dog is in pursuit of something or going somewhere
5  where we are able to recall the dog.
6  Q    Are you familiar with the term redirect?
7  A    Yes.
8  Q    What does redirect mean?
9  A    If the dog is directed towards a suspect and we
10 need to direct him towards a different direction, we are
11 able to give him a command to recall and redirect him.
12 Q    Okay. And the dog is trained with a single
13 call-off command; is there two levels of call-off
14 command?
15 A    I'm not sure I understand.
16 Q    Is there a stop command for the dog, sort of an
17 emergency brake that the dogs are trained to use?
18 A    You mean like they stay there or like just stop
19 in mid motion and stop?
20 Q    Whatever they are --
21 A    Typically, our training is when we call-off the
22 dog, the dog turns around and comes back to us.
23 Q    Okay. And so I guess what I am asking, so there
24 is a single call-off command?
25 A    Yes. Now, we can recall them back and down,
```
18

PAGE 19

```
1  what they call downing them. We can put them in a
2  position. But when we recall them, it's for them to
3  come back towards us.
4  Q    Okay. Is there a term of art you use to
5  describe a search that indicates an individual out -- or
6  individual item is out of reach of the dog?
7  A    Like if they are up high somewhere, we call it a
8  high find.
9  Q    High search? So high find is the term you use?
10 A    If they are up high, we use high find, and the
11 dog cannot reach them.
12 Q    A high find would be an object of the search
13 that is out of the reach of the dog?
14 A    Correct. When they locate that person, yes.
15 Q    And if I was to use the term nonsuspect bite,
16 what would you understand that to be?
17 A    A nonsuspect bite?
18 Q    Yes.
19 A    We bit somebody that was not the suspect.
20 Q    Does the department use the term nonsuspect
21 bite, accidental bite?
22 A    Typically, accidental.
23 Q    Would the biting of a nonsuspect or officer be a
24 nonsuspect bite?
25 A    Would the biting of an officer?
```
19

PAGE 20

```
1  Q    Yes.
2  A    Yes.
3  Q    Unless it was an officer --
4  A    That was a suspect. But, typically, no. I have
5  not encountered that yet.
6  Q    Get a little background from you. Are you
7  sergeant of the canine unit?
8  A    Yes.
9  Q    Are you the only sergeant of the canine unit?
10 A    Yes.
11 Q    How long have you had that assignment?
12 A    Little over five years.
13 Q    What is your understanding of your duties as the
14 canine sergeant?
15 A    I am responsible for supervising the unit. In
16 addition, I also work a patrol canine. But I have
17 supervision duties, everything from administrative to
18 time cards and monitoring their training, scheduling,
19 reviewing deployments, specifically apprehension
20 deployments. And that's pretty much the main focus of
21 my job.
22 Q    And what percentage of your time at the present
23 is typically spent on patrol?
24 A    The last couple months, I have been preparing a
25 lot of reports. I would say almost 80 percent has been
```
20

PAGE 21

```
1  in the office for the last few months. But typically,
2  it's 50/50, I would say.
3  Q    And back in April of 2009, how would you
4  estimate the split between your patrol and
5  administrative duties?
6  A    I would say somewhere around 50/50, maybe 60/40.
7  Somewhere in that area.
8  Q    Okay. Sixty towards --
9  A    Sixty towards patrol, 40 percent towards
10 administrative. Is that what you are asking?
11 Q    Yes, it was.
12 A    Yes, administrative.
13 Q    Prior to being assigned to the canine unit, what
14 was your previous assignment with the police department?
15 A    Patrol sergeant.
16 Q    And what division?
17 A    I worked for -- I was assigned graveyard, the
18 north area patrol --
19 Q    Okay. For how long did you have that position?
20 A    For -- since -- I went over to the canine unit
21 in July of -- I believe it was July, August of '06. So
22 January of '06, I had started -- I was a patrol
23 supervisor in that area.
24     Prior to that, I was day-shift patrol supervisor
25 for maybe about four months. Before that, I was a
```
21

Garcia v. City of Sacramento   January 23, 2012   STEVE OLIVERIA, Sgt. - Vol. 1

SHEET 7   PAGE 22

**PAGE 22**

1  supervisor in investigations for several months. And
2  prior to that, I was assigned to the homicide unit as a
3  detective. And that was before I got promoted.
4  Q    And when were you promoted?
5  A    In May of '05.
6  Q    Okay. And when were you a detective? When did
7  you make detective?
8  A    In 2001.
9  Q    And is detective a position or is that a rank in
10  the police department?
11  A    It's a position, it's a tested for. It's a
12  specialty position but not a rank. Just a lateral move.
13  Q    And did you have one or more than one assignment
14  as a detective?
15  A    More than one.
16  Q    Your last assignment as detective was with
17  homicide?
18  A    Correct.
19  Q    And your previous position as a detective?
20  A    In the robbery unit.
21  Q    Any positions before that?
22  A    No.
23  Q    When did you move from robbery to homicide?
24  A    Actually, I take it back. Before homicide, I
25  was felony assaults, which kind of blends with homicide.

22

**PAGE 23**

1  And I was robbery before that.
2  Q    When did you switch to homicide?
3  A    It was probably 2003.
4  Q    Okay. Prior to 2001 and becoming a detective,
5  what did you do for the police department?
6  A    I was a patrol officer.
7  Q    For how long?
8  A    I graduated from the academy in -- what was
9  it -- 1995. So March of '95, became a patrol officer.
10  I did about two years in patrol. I went to a
11  specialized unit called the neighborhood enforcement
12  team. I did that for one year. And that was, I
13  believe, in '08. And then after that, I was in patrol
14  until I became a detective.
15  Q    And when you said neighborhood policing, would
16  that be the nomenclature that the Sacramento Police
17  Department attaches to what is sometimes called
18  community-oriented policing or POP program?
19  A    It was similar. We were a city-wide team,
20  versus POP teams are assigned to neighborhoods. So we
21  were kind of do-all team. We were just tasked with all
22  different types of duties handed down from above.
23  MS. CHAPMAN: Sorry to interrupt. You said that
24  was in '08. Did you mean '98?
25  A    I'm sorry. It was '98, yes.

23

**PAGE 24**

1  Q    Have you ever been a party to a lawsuit?
2  A    No. Unless that one that I talked about
3  before -- I really don't think I was named in that one.
4  But it was a long time ago.
5  Q    Did you have any full-time non-law enforcement
6  experience?
7  A    No.
8  Q    Any military --
9  A    I'm sorry. Any full-time --
10  Q    Non-law enforcement experience work.
11  A    Just regular work?
12  Q    Yeah.
13  A    Yeah, I had other jobs.
14  Q    What other jobs?
15  A    My dad has a construction company, so I worked
16  construction all through high school, junior high, most
17  of college. I did -- I was a hotel manager for the
18  Raddison Hotel during college. I worked security at
19  ARCO Arena. Pretty much my jobs.
20  Q    Okay. Did you ever co-habitate with any other
21  Sacramento Police Department employees?
22  MS. CHAPMAN: I'm going to object on the grounds
23  it invades his right to privacy. Instruct the witness
24  not to answer.
25  Q    (BY MR. KATZ): Do you live with anyone who is

24

**PAGE 25**

1  employed by the police department?
2  MS. CHAPMAN: Same objection. Instruct the
3  witness not to answer.
4  Q    (BY MR. KATZ): Are you a college graduate?
5  A    Yes.
6  Q    What school?
7  A    Sacramento State.
8  Q    Do you remember what you majored in?
9  A    Criminal justice.
10  Q    Do you have any post-graduate courses?
11  A    No.
12  Q    Did you graduate high school?
13  A    Yes.
14  Q    Which high school?
15  A    Vacaville High School.
16  Q    Okay. As a patrol officer, were you ever
17  attacked by a dog?
18  A    I was bitten by a police dog, yes. Talking
19  about general dog or police dog?
20  Q    Okay. Any dog.
21  A    Yes.
22  Q    Was that a police dog?
23  A    I'm trying to remember if I was ever -- I'm sure
24  I have gotten nipped at by dogs on calls, but nothing
25  significant.

25

Garcia v. City of Sacramento    January 23, 2012    STEVE OLIVERIA, Sgt. - Vol. 1

SHEET 14  PAGE 50

1  Q    Do you keep track of how many people who are bit
2  on the head by police dogs?
3  A    No.
4  Q    Bit on the neck?
5  A    No.
6  Q    Genitals?
7  A    No. But those are all pretty rare.
8  Q    Does the canine unit track the number of
9  nonsuspect bites?
10 A    Yes.
11 Q    How are those records maintained?
12 A    Depending on the year, it was either KATS, the
13 KATS system or now the canine tracking system.
14 Q    So in the KATS system, was there a separate
15 category of unintended bites?
16 A    Yeah, there was check off for accidental or
17 unintended bite.
18 Q    Would you -- do you know how many nonsuspect
19 bites there were in 2008?
20 A    Specifically, no. But I would say on average,
21 anywhere between three to five a year is -- some --
22 actually, might have had a year where we had one or two
23 but --
24 Q    Do you ever pull those -- have you ever done a
25 report indicating how many?

50

PAGE 52

1  I am not 100 percent on -- we look at each individual
2  bite per incident to see whether or not it was within
3  policy and -- but I have done it just to check random.
4  But I have never been asked for it, no.
5  Q    And what did -- did you write down the figures?
6  A    I think it was something I was just playing
7  with. You know, I have been to classes where they talk
8  about bite ratios, so I was just curious. But we don't
9  do any special report on it.
10 Q    Does the department -- sorry. Does the canine
11 unit track the types of deployments used, for example,
12 building search, area search, narcotic search, direct
13 sends?
14 A    Yes.
15 Q    And does it compile those figures on an annual
16 basis?
17 A    Pretty much. I mean, whenever I get asked for a
18 report I can do -- I can do the stats on all those
19 criteria you just mentioned. I can pull up the numbers
20 for how many direct sends we had or building searches or
21 felony stops. I can do all that.
22 Q    Do you know how many area searches there were in
23 the year 2009?
24 A    No, I don't.
25 Q    Does the department keep track of how dogs are

52

PAGE 51

1  A    Yeah, every year I -- like I mentioned before,
2  the yearly reports we do, we look at it. And I get
3  requests from our internal affairs unit of random
4  requests to run stats and do audits. And I don't have
5  those dates or anything, but we look at all that. We
6  meet with our risk management department and discuss
7  them.
8  Q    Does the canine unit retain a copy of the red
9  border forms originating from its officers?
10 A    Temporarily. I keep -- I keep a copy to do my
11 review. And then after I am done doing my review, they
12 get disposed.
13 Q    Does the canine unit compile or keep records of
14 what the underlying offenses are that led to the
15 deployment of the dog?
16 A    No. There is no specific box for that. That's
17 usually just written in the narrative, so no.
18 Q    Does the canine unit keep track of the ratio of
19 bites to opportunities to bite?
20 A    The system doesn't do it for us, but I can go in
21 there and make up those stats.
22 Q    Have you ever done that?
23 A    I have done that before.
24 Q    Why?
25 A    Just because you hear people talk about ratios.

51

PAGE 53

1  deployed?
2  A    Does the department keep track of?
3  Q    The canine unit, rather. I'm sorry.
4  A    How the dogs are deployed?
5  Q    Yes.
6  A    I don't understand.
7  Q    In other words, every time they're deployed, is
8  there an entry created?
9  A    Yes.
10 Q    And were those entries through KATS?
11 A    In '09?
12 Q    Up to 09.
13 A    Yes.
14 Q    What point did you switch from KATS to the
15 canine tracker?
16 A    2010, January.
17 Q    Is it correct that every time there is a bite,
18 there is an incident report created?
19 A    Yeah, or a crime report or incident report,
20 depending on what the circumstances are.
21 Q    And the reports are all part of the same
22 numbering system, whether it's a crime report or
23 incident report, correct?
24 A    What do you mean?
25 Q    In other words, those numbers are generated by

53

**Scribe Reporting & Legal Copying**
(916) 492-1010                    FAX (916) 492-1222

Garcia v. City of Sacramento   January 23, 2012   STEVE OLIVERIA, Sgt. - Vol. 1

SHEET 15   PAGE 54

PAGE 54

1  dispatch, correct?
2  A    All our case numbers, whether it's incident
3  report or a crime report, yes, it's generated by the
4  dispatch, our computer-aided system.
5  Q    Are the incident or crime reports created by
6  canine officers in connection with dog bites, are copies
7  maintained by the canine unit?
8  A    Are copies of the report maintained by the
9  canine unit?
10  Q    Yes.
11  A    No, all our reports are automated on the
12  computer system. So any time we need them, we just pull
13  them up.
14  Q    So if you needed -- for example, if you were
15  looking for the report on case, O8367386, you would
16  simply punch that number in the computer, correct?
17  A    Correct.
18  Q    And then you would see a PDF version, correct?
19  A    I could get a PDF version.
20  Q    So you get either a PDF version or electronic
21  sort of --
22  A    Yeah, it's called Versadex. And it's got -- I
23  click on individual supplements and read that, or what
24  we call entities or suspects, witnesses. Or I can make,
25  like you said, a PDF version that puts it all in one,

54

PAGE 55

1  which is like what you have here. What it looks like
2  when it's PDF.
3  Q    And am I correct if you need to see a report or
4  reports by a particular officer, you simply need to sit
5  down at the computer terminal and punch in the number of
6  the reports, correct?
7  A    That's correct.
8  Q    And for how far back can you get those reports?
9  A    We went to the system sometime -- I remember I
10  was in homicide at the time. So I would say somewhere
11  around 2004, 2005 -- I think it was 2004 we switched
12  over to Versadex. Before, we were old school. Yeah,
13  you would have to request reports from records, and it
14  was a pain.
15  Q    So since you have been the sergeant of the
16  canine unit, it's simply a matter of punching in the
17  report number, correct?
18  A    Correct. I haven't pulled up old, old reports,
19  but I assume I still can. But I haven't had a reason
20  to.
21  Q    Okay. Now, does the canine unit keep track of
22  use-of-force reports pertaining to its officers?
23  A    Use-of-force reports. Are you talking the one
24  that the department does, the supervisors?
25  Q    Yes, the administrative review of the use of

55

PAGE 56

1  force?
2  A    Use of force. Not the one I do but --
3  Q    Not the canine.
4  A    I do not keep copies. I actually don't even see
5  those. When one of our dogs does bite a suspect or
6  anybody and they do a use-a-force report, I do an
7  independent -- I do my own thing. And then whoever the
8  field supervisor was for that incident, they are the
9  ones that initiate the use-of-force report review. And
10  that goes through their chain and over to my boss and
11  up. I never see that.
12  Q    Okay. Now, do you also do something -- are you
13  familiar with something called a canine apprehension
14  review?
15  A    Yes, I do that. I review all our canine
16  apprehensions.
17  Q    And are records of those apprehensions
18  maintained?
19  A    Yes.
20  Q    How are they maintained?
21  A    Well, when I first started, we were doing a memo
22  format. So I would electronically -- a Word document.
23  Print it up. I had kind of a little format set up. So
24  I would type those out. But at a certain point in '08,
25  we just -- it was very redundant. I was basically

56

PAGE 57

1  rewriting the report and going over the things. And it
2  was just -- we determined it was easier. I was only
3  required to review, make sure I reviewed. And if there
4  were incidents, I could comment and do retraining if
5  necessary.
6       So in the middle of 2008, we switched to where I
7  just put my review comments into either KATS then
8  eventually canine tracker.
9  Q    Do you recall when in 2008 that transition came?
10  A    It was sometime in July.
11  Q    Does the canine unit track the demographics of
12  the individuals who get bit by their dogs?
13  A    Our system does. Our new system does. And I
14  can't recall if KATS did, but it may have also. But I
15  know canine tracker, the last couple of years, it
16  actually was an entry, the race and sex of the suspects.
17  Q    And have you determined for the year 2000 -- was
18  it January 2009 or January 2010 you went to canine
19  tracker?
20  A    2010.
21  Q    And in the year 2010, do you know what the
22  racial breakdown was on people who were bitten?
23       MS. CHAPMAN: Objection. Relevance. You can
24  still answer.
25  A    I do not.

57

Garcia v. City of Sacramento    January 23, 2012    STEVE OLIVERIA, Sgt. - Vol. 1

SHEET 16   PAGE 58

```
 1  Q     (BY MR. KATZ):  Do you know the gender
 2  breakdown?
 3  A     No.
 4  Q     Is there an ethnicity breakdown?
 5     MS. CHAPMAN:  Same objection.
 6  A     There is -- it's just a race.  It would be -- I
 7  think the categories are white, black, Hispanic, Asian
 8  and maybe another.
 9  Q     (BY MR. KATZ):  Okay.  Has the canine unit ever
10  compiled those statistics?
11  A     No.
12  Q     Have you ever been asked regarding what the
13  breakdown is on those?
14  A     No.
15  Q     Before you started making notations on the KATS
16  log or canine tracker, did you retain a copy of the
17  canine apprehension reviews?
18  A     Yes.
19  Q     Where are those maintained?
20  A     In my computer in file.
21  Q     Do those still exist?
22  A     Yeah, they do.
23  Q     Okay.  And am I correct that there should be a
24  canine apprehension review for every bite that occurred
25  prior to 2009 while you were --
                                                    58
```

PAGE 59

```
 1  A     You mean a hard copy like a memo format?
 2  Q     Either a memo format or digitalized version of
 3  that?
 4  A     There still is up through this year.  There's
 5  some type of review whether it's done in the memo format
 6  up to July of '08 or in the canine tracker or KATS
 7  system, there is some kind of comment.  Very brief now
 8  with our thing, because as long as I review and analyze
 9  it, I will put in there something to the fact that I
10  reviewed the report, you know, whether I saw any issues
11  or not.  And that's basically the gist of it.  So no
12  longer do I have to, you know, rewrite the summary of
13  what happened.  And that's all in the report.
14     MS. CHAPMAN:  And for the record, the witness is
15  pointing to, as an example, Exhibit 32.
16  Q     (BY MR. KATZ):  Okay.  We will get to Exhibit 32
17  later.  Now, was it the -- in the canine tracker, what's
18  the format of your comments?
19  A     When I review a bite?
20  Q     Yes.
21  A     It's that I will put in there that I reviewed it
22  and if there was any issues.  If there were some issues
23  or if I did anything additional, I will notate it in
24  there.  And that's pretty much the gist of it.
25  Q     And the canine tracker that's a template.
                                                    59
```

PAGE 60

```
 1  That's a screen that comes up?
 2  A     Yes.
 3  Q     And is there a particular box -- what are the
 4  different, frankly, I don't have one of those,
 5  apparently.  What information is contained on there?
 6  A     Starts with the case number, the date and time
 7  of the incident, and it has the type of deployment, you
 8  know, whether it was a building search, area search,
 9  what units we would be assisting, whether it was patrol
10  or SWAT team or whatever it is.
11     It will have the area, like the district.  We
12  were broken up in six different districts in the
13  department.  So say what district it occurred in, the
14  clearance code, which is basically how the call was
15  cleared, whether it was a bite or unable to locate or
16  find or whatever.  And then has a spot for their name,
17  birth date, race and sex.  Pretty much it.
18  Q     Okay.  Are the clearance codes, are those set
19  out, in other words, here are the potential clearance
20  codes?
21  A     Yes, they have to choose one option.
22  Q     What are the options?
23  A     For the clearance codes?
24  Q     Yes.
25  A     You got assist, you got a bite, you have
                                                    60
```

PAGE 61

```
 1  surrender, you have a find, you got unable to locate or
 2  GOA, which is gone on arrival.  There is a bunch of them
 3  also for the narcotics or explosives or gun, whether
 4  they found drugs or not and UTL drugs or guns or bombs.
 5  What else is on there?
 6     (Discussion held off the record.)
 7  Q     (BY MR. KATZ):  So gone on arrival means what?
 8  A     UTL, we put it together.  For suspects, like if
 9  we are doing something with a suspect, UTL, it's GOA.
10  Q     Unable to locate?
11  A     Unable to locate or GOA.  Basically, means if
12  you get there and the guy -- you know, you do a search
13  for a suspect and he's not there, you can't find him, he
14  either got out of the perimeter, or we couldn't find
15  them for whatever reason, then we put UTL GOA.
16  Q     And does assist mean?
17  A     Assist we took part in a call, say, we did a
18  warrant service.  And the suspect is -- you know, lot of
19  times we take rear perimeters.  A lot of suspects like
20  to run out the back, so we'll take rear perimeters and
21  hold that while officers make contact at the door.  And
22  say the suspect is there and they take him into custody.
23     So when we assist and we assisted on the call,
24  but our role -- our dog didn't play a major role in the
25  apprehension or surrender of the suspect, then we'll use
                                                    61
```

Garcia v. City of Sacramento   January 23, 2012   STEVE OLIVERIA, Sgt. - Vol. 1

**SHEET 17   PAGE 62**

1  assist.
2  Q    And what does bite refer to?
3  A    They bite the suspect.
4  Q    What does surrender refer to?
5  A    Surrender is if our dogs were there and they
6  played a role in either the guy giving up, coming out,
7  you know, something to that effect, then we will use
8  surrender.
9  Q    Is there another category for patrol activities?
10 A    Like -- well, no. You mean like specifically
11 for patrol activity?
12 Q    Yes. In other words --
13 A    No, because only enter into KATS if our dogs
14 were out of the car deployed to do something. So it's
15 got to fit one of those categories.
16 Q    And what are the categories that canine tracker
17 has for --
18 A    That was canine tracker.
19 Q    Right. For types of activity.
20 A    For -- oh, area searches, building searches,
21 direct sends, felony car stop, search warrants, attempt
22 pickups, which are warrant services, narcotic search,
23 explosive search, firearm search, article search.
24     MS. CHAPMAN: Slow down.
25 A    I'm sorry. Call for service. I think there is,

62

**PAGE 64**

1  looking for specific summaries on certain -- like all
2  our surrenders. If you want all surrenders, that would
3  be a major task, because you have to go through and
4  figure out -- I could print a report that shows like all
5  the case numbers related to, you know, that resulted in
6  surrenders. But then I would have to go individually
7  and type in each case number and print up each report.
8  Q    So actually, it would be easier to do a time
9  range?
10 A    Other than killing a hundred trees. But, yeah,
11 for me it would be much easier.
12 Q    Okay. Let me have this marked as next in order,
13 which would be 34.
14     (Whereupon the court reporter marked
15     Exhibit 34.)
16 Q    (BY MR. KATZ): Showing you Exhibit 34. Is this
17 what a canine tracker looks like?
18 A    Well, this is what a -- if I go in and pull up
19 this specific deployment, this is what it looks like.
20 Q    Okay. So if you punched in the report number
21 11-282390, this is what would appear?
22 A    Depending on which report I did, yes.
23 Q    Okay. Now, is it the policy of the canine unit
24 to review all of the bites?
25 A    Yes.

64

**PAGE 63**

1  you know, something -- call for service in there. There
2  may be a few more, but that's the main ones.
3  Q    (BY MR. KATZ): Okay. And in terms of the
4  canine tracker, are those all -- do you print out hard
5  copies of those, typically?
6  A    No. I mean, if someone asked me for a report or
7  something, I can, yes.
8  Q    Okay. And are all the -- if you wanted to print
9  out all the canine tracker entries for 2010, how would
10 you do that?
11 A    I would just go in the system and punch in a
12 date, date range. And there is different selections I
13 can do for reports. You know, they would give like
14 summary of every one or I can just do the number stats
15 for the types of deployments. Just depends what I am
16 looking for.
17 Q    So a matter of minutes?
18 A    Well, to actually pull up the report, yeah. It
19 could be a matter of minutes. It depends. If you just
20 want the -- like if someone just asked me, I want all
21 the deployments for 2010, it would be hundreds and
22 hundreds of pages. But I could pull it up probably in
23 several minutes.
24 Q    Just take awhile to print.
25 A    Take a long time to print. But if somebody is

63

**PAGE 65**

1  Q    Is it the practice of the canine unit to review
2  all their bites?
3  A    I'm -- was that a different question?
4  Q    It could be.
5  A    I don't know.
6  Q    It was a different question. I don't know. The
7  answer may or may not be the same.
8  A    Yes, I mean, when you say can, you know, it's
9  me. I do the reviews.
10 Q    Okay. And do you, as a matter of course,
11 typically discuss those reviews with other members of
12 your unit?
13 A    It's my specific -- no, not necessarily. But if
14 I see a -- if there was some type of deployments we had,
15 there may have been some issues or training issues or
16 ways we did stuff, I may bring it up in our canine
17 meeting. But I don't specifically discuss my reviews of
18 them with the officers, no.
19 Q    Why do you review?
20 A    Just to keep track, make sure it was within
21 policy, that there aren't any issues, that the handlers
22 are deploying properly. My main concerns.
23 Q    And what do you review when you review a bite?
24 A    Primarily, it's the police report.
25 Q    And at the time of the incident, is that what

65

Garcia v. City of Sacramento   January 23, 2012   STEVE OLIVERIA, Sgt. - Vol. 1

SHEET 20   PAGE 74

1  know, I didn't come up with this. This was already in
2  use when I took over the unit. So I didn't come up with
3  the checklist or any -- it was already there. So I
4  utilized what they were using.
5  Q    So the canine apprehension review form,
6  Exhibit 31, preceded your assignment to the canine unit?
7  A    Correct.
8  Q    Do you have any understanding as to for how many
9  years that had been in place?
10 A    I do not know.
11 Q    Okay. So in the box next to resistance, what
12 would you put in there?
13 A    If the suspect was running, fleeing, fighting.
14 Q    Okay. Would that box always be checked or would
15 that be depending upon what you wrote there?
16 A    Typically, it would be checked and it would say
17 whether the person was hiding or, you know, fleeing,
18 running, in pursuit, that sort of thing.
19 Q    Okay. Now, what is the threat to officer/public
20 refer to?
21 A    If there is information that may be, you know,
22 they had gun history, criminally arrested for gun
23 possession in the past or maybe they were seen with a
24 gun or shooting, warrant, something like that. We would
25 comment in there.

74

PAGE 75

1  Q    Would that be based upon the knowledge when you
2  were reviewing the reports, or does that refer to what
3  is known to the officer at the time of deploying the
4  dog?
5  A    Both. For me, when I am writing this, I am
6  going based off the report and based off what they knew
7  prior to the deployment of the dog.
8  Q    Okay. Location, hiding. What does that refer
9  to?
10 A    If they were -- you know, if they were hiding in
11 a building or wherever they were. And sometimes I think
12 I even put the address if it was a house or something.
13 Q    Okay. And history of violence, what does that
14 refer to?
15 A    That would be the criminal history. So a lot of
16 times if we knew who the suspect was, we could do
17 background checks. We could put in there, you know,
18 robbery history or burglary history or whatever,
19 narcotics. We could put or actually for history of
20 violence, it would be anything to do with violent-type
21 crimes.
22 Q    Okay. And what does weapons refer to?
23 A    Any kind of weapons history or knowledge that
24 the suspect may be armed.
25 Q    So either history or information suggesting the

75

PAGE 76

1  person may have been armed?
2  A    Correct. A lot of this stuff is kind of
3  repetitive, but it's what I had.
4  Q    And there is a box, "Suspect had not been
5  searched."
6  A    Yes, that is for someone that ran from the
7  officers, and the officers never had a chance to pat him
8  down or do anything. Sometimes, the officers contact
9  these guys, pat them down. And while they are working
10 with them or running them in warrants, these guys take
11 off running. And so sometimes maybe the suspect has
12 been patted down so we know they don't have weapons.
13 But most of the time, we don't know. So that's when we
14 mark that box.
15 Q    In 2009, how many times had a suspect been
16 searched prior to a dog being deployed?
17 A    Not very many.
18 Q    Any?
19 A    Possibly, yeah. It happens. We -- I mean, we
20 have young officers out there that sometimes, you
21 know -- for me, I used to put -- if I was suspicious of
22 somebody, I would put them in the backseat of the car.
23 But I can't tell you how -- we've had guys run away with
24 handcuffs on. So it happens.
25 Q    Okay. Have there been bites of handcuffed

76

PAGE 77

1  suspects?
2  A    No, but depending on the circumstances, I
3  wouldn't necessarily say it wouldn't apply, because they
4  could have access to weapons, depending where they are
5  hiding or where they end up. But, no, we have not.
6  Q    Okay. And what does deployment approval refer
7  to?
8  A    Who approved it, the use of the canine.
9  Q    Okay. And then there is a section called canine
10 announcements.
11 A    Yes.
12 Q    And what is the importance of that?
13 A    That's just who made -- how the announcements
14 were made, whether it was the handler making is own
15 announcements, whether they were on the PA, whether the
16 air unit made the announcements. And -- or if there
17 were no announcements, why?
18 Q    And was it your practice to fill out this form?
19 A    Yes.
20 Q    And when you use these hard copy forms, did you
21 go down and go through the checklist?
22 A    Yes.
23 Q    Okay. Then there is a box, location found
24 hiding. Is that when there is a search?
25 A    Yeah, that's just where they were found, usually

77

Garcia v. City of Sacramento   January 23, 2012   STEVE OLIVERIA, Sgt. - Vol. 1

SHEET 21  PAGE 78

PAGE 78

1  the address.
2  Q    And then suspect/handler/canine action. What
3  does that refer to?
4  A    That's the summary. So basically, I just
5  summarized the report in that section.
6  Q    Okay. And the injuries to suspect?
7  A    Just the injuries that the suspect incurred.
8  Q    And what would the source for that information
9  be?
10  A    The report or the red border form. And then we
11  would mark the box if they were just treated at the
12  scene, if they were transported to a hospital or taken
13  straight to the jail and cleared by the nurse.
14  Q    And then there was the option for policy issues?
15  A    Yes.
16  Q    In 2009, how many deployments did not meet the
17  department guidelines as you understood them?
18  A    None.
19  Q    What about 2008?
20  A    Since I've been there, I don't think I have had
21  one that do not meet the department guidelines.
22  Q    Okay.
23  A    Other than accidental or something.
24  Q    But --
25  A    They were within -- yes, they were deployed

78

PAGE 79

1  appropriately, but we just bit the wrong guy. So they
2  were still within the department policy.
3  Q    So since you have been the head of the canine
4  unit, would it be a correct statement that every bite
5  that occurred was as a result of a deployment that met
6  the department guidelines?
7  A    Yes.
8  Q    And then training issues?
9  A    There's been some. And we -- along the way, we
10  have corrected them and addressed them with the entire
11  unit. We try to learn from every error or mistake or
12  things that people encounter. So we weekly meet as a
13  unit together and review all the deployments and any
14  issues that may have occurred and try to learn from
15  them.
16  Q    Okay. And final charges, what does that
17  represent?
18  A    That's what they were booked for.
19  Q    Okay. And then what type of information would
20  be contained in additional information?
21  A    Just what -- I can't recall if I used to put
22  very much in there. I think sometimes I may have put in
23  there like if -- maybe some criminal history issues on
24  the suspect, or I don't know. It was just there in case
25  I needed it. I don't recall what I would put in there,

79

PAGE 80

1  actually.
2  Q    Okay. And then there is the apprehension or
3  review completed by. Would that have been whoever did
4  this form?
5  A    That would be me.
6  Q    There is also a box entitled Reviewed by
7  Trainer. Do you see that?
8  A    Yes.
9  Q    What does that represent?
10  A    Well, when we brought on a new trainer -- Steve
11  Brewer. So when I came in '07, he became our trainer.
12  So prior to me -- actually, when I took over the unit in
13  '06, our trainers were handlers, experienced handlers on
14  the unit. So then -- but we were starting to lose those
15  experienced handlers and so I had to find a different
16  trainer. And so it was new thing. And since I was
17  doing this, the thought was thrown around about having
18  the trainer review this too. But logistically, it just
19  wasn't good. Some of the blanks I had that I used
20  had that box in there, and some of them probably didn't.
21  Q    Well, were these reviewed by the trainer after
22  you took over?
23  A    You know, he may have done a couple. But --
24  initially, I think I may have shown him some, but I
25  don't recall. It wasn't a practice, because it was just

80

PAGE 81

1  the logistics of getting him to look at all these were
2  just -- but if I had a problem with an apprehension or a
3  training issue, we discussed it with him at training.
4  But he did not review all these.
5  Q    Now, you mentioned the weekly canine meetings?
6  A    Yes.
7  Q    When would those occur typically?
8  A    Wednesday nights at 5:00 p.m.
9  Q    What would typically happen at those?
10  A    That's when I addressed the unit as a whole.
11  That's where we have our overlap day. So everybody is
12  there, and we discuss, you know, week's deployments,
13  what happened, maybe crime bulletins, information on
14  things we need to focus on for the week.
15      And then people go around, and everybody gets a
16  chance to go around and, you know, any deployments that
17  they had or incidents they had that they wanted to
18  discuss, it was their option to do so.
19  Q    Okay. Would you ever -- did you ever show
20  photographs of injuries at a Wednesday meeting?
21  A    No.
22  Q    Did you ever show videotapes at a Wednesday
23  meeting?
24  A    We may have shown videotapes. If I had like
25  apprehension tapes or some type of pursuit type or

81

Garcia v. City of Sacramento   January 23, 2012   STEVE OLIVERIA, Sgt. - Vol. 1

SHEET 22   PAGE 82

**PAGE 82**

1 something for training purposes, we may do that.
2 Q     And when you were looking at a tape for training
3 purposes, what are you looking for?
4 A     Just depends on the circumstances. But, you
5 know, if it was a pursuit and we'd look at that for
6 the -- how the pursuit was, how far the officer maybe
7 positioned his car if he did deploy from the car.
8 Mainly for training.
9 Q     In your review of videos, did you ever find
10 occasions when the video -- what you saw in the video
11 did not match up with what the officer had written in
12 his report?
13 A     No. No.
14 Q     Okay. What is the importance of a dog
15 responding to a call-off?
16 A     The ability to call him off so he doesn't engage
17 the person. That way, if I need to avoid someone being
18 apprehended or the wrong person being bit, we can recall
19 the dog.
20 Q     How important is it a canine unit if dogs
21 don't respond to call-off commands?
22 A     It's important that they do.
23 Q     And would you expect a failure to respond to a
24 call-off command to be reported to you?
25 A     Yes.

82

**PAGE 84**

1 still answer.
2 A     It wouldn't have made a difference on the actual
3 deployment of what happened. Now, if the dog rebit and
4 there was -- and the dog did it on his own, that would
5 be -- could be a retraining issue. Now, if Gary Dahl
6 took the dog and then after the guy was restrained and
7 put the dog back on the suspect, then absolutely. That
8 would be out of policy.
9 Q     (BY MR. KATZ): But your understanding was you
10 had -- that the dog never attempted to make contact with
11 Garcia after being called off him, correct?
12 A     Once the dog came back, Officer Gary -- or
13 Officer Gary Dahl had the dog back? No. I was not
14 aware of any of that.
15 Q     And would it have been important for a
16 subordinate to relay that information to you?
17 A     Yes.
18 Q     Let's have this marked as next in order.
19       (Whereupon the court reporter marked
20       Exhibit 35.)
21 Q     (BY MR. KATZ): Do you recognize Exhibit 35?
22 A     It's a page from the canine tracker. I'm sorry,
23 KATS. KATS.
24 Q     Scared me a second.
25 A     Yes. It's KATS.

84

**PAGE 83**

1 Q     Would you expect a dog biting someone after
2 being called off to be reported to you?
3 A     Yes.
4 Q     Would you expect a dog rebiting after being
5 physically pulled off to be reported to you?
6 A     Sure.
7 Q     Was it ever reported to you that in this
8 instance, James Garcia -- that Dahl's dog bit Garcia
9 after being taken off of him?
10 A     No, it was not.
11 Q     Did you ever watch the video?
12 A     Of him being bit?
13 Q     Yes.
14 A     I saw the helicopter video.
15 Q     Did you observe the portion of the video that
16 shows the dog being pulled off him?
17 A     And then coming back --
18 Q     Yes.
19 A     -- and biting him again? I not see that on the
20 tape.
21 Q     If that was the case, would that have an impact
22 on your opinion as to whether or not the incident was
23 within policy?
24       MS. CHAPMAN: Objection. Calls for speculation,
25 lacks foundation. Also vague and ambiguous. You can

83

**PAGE 85**

1 Q     Now, this is hopefully a -- it's not a great
2 copy, but all the information has been made, so I am
3 wondering if you can walk us through -- first of all, is
4 this what an incident detail report looks when it's
5 printed out?
6 A     Yes, it appears so.
7 Q     And what is the sort of -- let's proceed in a
8 logical, boring manner. Date/time, what does that refer
9 to?
10 A     The date and time of the incident.
11 Q     And now there is type. What types were
12 available under the KATS system to enter?
13 A     Pretty much the same as what we discussed in
14 canine tracker. Pretty much moved over the same type
15 of -- incident types over to -- we use the same. There
16 may be some differences, but I don't recall the
17 differences. But in general, they were the same.
18 Q     Okay. And what does location refer to?
19 A     Location of the incident.
20 Q     And UCR is Uniform Criminal Reporting Code?
21 A     Yes, which we didn't utilize that portion.
22 Q     Now, there is a section called incident details.
23 Was that typically filled out?
24 A     Like environment, weather conditions, we didn't
25 really use. Summary of the incident, I think that is

85

Garcia v. City of Sacramento   January 23, 2012   STEVE OLIVERIA, Sgt. - Vol. 1

SHEET 24   PAGE 90

1  that correct?
2  A     From my understanding, they went to an automated
3  system.
4  Q     When did they do that?
5  A     I don't know.
6  Q     Do you remember when you last, as a field
7  supervisor, used one of these?
8  A     Yeah. It would have been right before I went to
9  canine. So probably 2000 -- sometime in 2006.
10  Q     So you didn't use those when you were working
11  canine?
12  A     No, because the field supervisor is the ones
13  that respond to these type of incidents. And they do
14  their own review. So they do these, I don't do these.
15  Q     Okay. So that doesn't -- in the custody chain
16  or the chain of review for the use-of-force reports did
17  not include the canine sergeant for incidents that
18  involved canine officers, correct?
19  A     Correct. They try to keep that -- they wanted
20  two independent reviews.
21  Q     And was it your understanding that canine bites
22  were described as a type of force used?
23  A     Yes.
24  Q     And were the forces listed in any type of
25  hierarchy, in other words, generally less to generally

90

PAGE 91

1  greater?
2       MS. CHAPMAN: Objection. Vague and ambiguous.
3  You can still answer.
4  A     I don't believe so.
5       (MR. KATZ): Have this marked as exhibit next in
6  order.
7       (Whereupon the court reporter marked
8       Exhibit 36.)
9  Q     (BY MR. KATZ): Do you recognize -- Exhibit 36
10  is a two-page document. Do you recognize that?
11  A     Nope.
12  Q     Are you familiar with what is called a blue
13  team?
14  A     I am familiar with it.
15  Q     This isn't a blue team form, is it?
16  A     I don't know. I have never had to use blue
17  teams since they have started using them. So I don't
18  even know what it looks like or if that is part of it or
19  not.
20  Q     Okay. Let me direct your attention back to
21  Exhibit 12, which is the first thing I gave you.
22  A     Yeah.
23  Q     Were the practices of the canine unit consistent
24  with the written policy as set forth in Exhibit 12 at
25  the time of this incident?

91

PAGE 92

1  A     Yes.
2  Q     What was the importance of following the city's
3  policy regarding the use of canines?
4  A     It's the policy. We are supposed to follow it.
5  Q     Why is it important to follow a policy?
6  A     Well, it keeps officers acting properly and
7  following the rules of the law and to do what the
8  department expects of them.
9  Q     Okay. By the way, are the department dogs -- is
10  the deployment of department dogs consistent with POST
11  guidelines?
12  A     The deployment of them?
13  Q     Yes.
14  A     Well, the training of them. Trying to recall
15  that POST really has deployment guidelines. I don't
16  think they actually have deployment guidelines. They
17  are mostly for the training. And they might have
18  recommendations based on suggestions and stuff. But
19  basically, we just meet the POST standards for the
20  training.
21  Q     And it was your understanding that the training
22  met the POST standards? Do you call them guidelines or
23  standards? What did you refer to them as?
24  A     They are guidelines, but, yes, we did. We treat
25  them as standards, but they are guidelines.

92

PAGE 93

1  Q     And at the time of the incident, was that the
2  case?
3  A     Yes.
4  Q     Direct your attention back to Exhibit 12.
5  A     Um-hum.
6  Q     Was it the policy of the city to only use
7  canines in appropriate circumstances and review all
8  injuries received from department canines?
9  A     Yes.
10  Q     So what would the review of the injuries consist
11  of?
12  A     Reading the reports and what happened to them
13  and the red border form and knowing whether or not they
14  had to go to the hospital. So that's what I would
15  review.
16  Q     Did you ever note a difference in the number
17  of -- the relative number of bites by different
18  handlers' dogs that resulted in the person going to the
19  hospital?
20       MS. CHAPMAN: Object, as vague and ambiguous.
21  You can still answer if you understand.
22  Q     (BY MR. KATZ): Do you understand the question?
23  A     Yeah. No, not necessarily. Like I said, for
24  liability reasons, we pretty much take everybody to the
25  hospital unless it's a scratch or something that is

93

Garcia v. City of Sacramento   January 23, 2012   STEVE OLIVERIA, Sgt. - Vol. 1

SHEET 25   PAGE 94

1  really minor that the medics didn't even want to touch
2  or treat, because it was like nothing, which happens
3  here and there. You know, sometimes maybe they are
4  wearing cowboy boots, and it's wintertime and they are
5  wearing heavy jackets and really didn't leave any injury
6  or, you know, substantial injury.
7       Otherwise, for -- what's the word I am looking
8  for -- just cover our back, make sure they get the
9  treatment that they need, we take them to the hospital.
10 Q    Okay. Now, directing your attention to the
11 capital letter A under the procedure. Do you see that?
12 A    I am sorry, where? Big A?
13 Q    Yes, big A.
14 A    Got it.
15 Q    Okay. Under one, "Approval shall be obtained
16 from a field supervisor prior to using a canine to
17 search for or apprehend an individual. Exception, a
18 rapidly evolving situation that is within the deployment
19 guidelines where it is impractical to obtain supervisory
20 approval."
21      Was that the practice of the canine unit as of
22 the date of this incident?
23 A    Yes.
24 Q    And a rapidly evolving situation would be where
25 there is not time to make calls or wait for responses?

94

PAGE 95

1  A    Yes.
2  Q    In other words, something that is developing
3  quickly and an officer has to, in those instances, rely
4  on sort of split-second judgment?
5  A    Yes.
6  Q    And your understanding is that A 1 is designed
7  to accommodate that type of split-second decision that
8  an officer sometimes has to make in the field?
9  A    Sure, yes.
10 Q    Okay. And then under A-2, was that generally
11 followed, actually sets forth policy. Was it your
12 understanding that sometimes things don't fit in neat
13 boxes?
14 A    Yeah. It's there if there is a situation like
15 that, but we didn't use it very often. We pretty much
16 stuck to the general deployment guidelines.
17 Q    Okay. Which I presume is why they were the
18 general deployment guidelines?
19 A    Yes, but you never know. There are situations
20 that may not fit. But looking at the totality of the
21 circumstances may be appropriate to use a dog. So
22 that's what that covered.
23 Q    And there is nothing particularly unique about
24 an area search of a yard, is there?
25      MS. CHAPMAN: Objection, calls for speculation.

95

PAGE 96

1  A    Depends on the yard. There could be unique
2  situations, absolutely.
3  Q    (BY MR. KATZ): In general terms, an area search
4  of an enclosed yard is a fairly standard canine
5  activity, correct?
6  A    Yes, we do it a lot.
7  Q    Okay. And then three, "Watch commander shall
8  notify the metro special operations lieutenant of any
9  performance issues regarding handlers or canine."
10      Was that followed?
11 A    We have watch commanders call if they had
12 questions about deployments or some issues and they
13 notified the lieutenant. So I may have not been privy
14 to all of them, but I know it has happened.
15 Q    Okay. Now, moving down to B, do you see
16 deployment guidelines?
17 A    Yes.
18 Q    And does it say, "Department canines may be used
19 to apprehend an individual if the canine handler and
20 approving supervisor reasonably believe that the
21 individual has either committed or is about to commit
22 any offense and if any of the following conditions
23 exist"?
24      And approving supervisor, that would refer to
25 the field supervisor?

96

PAGE 97

1  A    Correct.
2  Q    Okay. One, "There is a reasonable belief that
3  the individual poses an immediate threat of violence or
4  serious harm to the public, any officer or the handler."
5       What does -- what do you understand that to
6  mean?
7  A    That we have a reasonable belief to believe that
8  this guy or this man or woman, or whoever, that is, you
9  know, hiding from us, fleeing from us could be a danger
10 to -- you know, whether it be the officers who are now
11 required to go out and search for them or residents in
12 the neighborhood.
13      We have had a lot of incidents where these folks
14 are breaking into homes to hide from officers. And
15 lot -- some of these homes are occupied. They are able
16 to gain access to weapons. It's amazing what we find in
17 sheds, from tools and, you know, machetes to you name it
18 that could be used.
19      So could also mean that if we know who the
20 person is and they have done the record checks, that
21 he's got a serious criminal history or he's got violent
22 crime in his history or gun charges, things like that.
23 And we also base it off the crime too. If he just
24 committed a robbery or serious crime like that or even
25 auto theft, or these guys carry weapons or tools that

97

Garcia v. City of Sacramento   January 23, 2012   STEVE OLIVERIA, Sgt. - Vol. 1

SHEET 31  PAGE 118

1  incident happened.  So it may have been over the phone
2  or could have been when I got back from vacation.
3  Q     Okay.  "With the concurrence of the on-scene
4  supervisor, no warning may be given if it would increase
5  the risk of injury or escape."
6  A     Yes.
7  Q     Was that the policy?
8  A     That was the policy.
9  Q     Was that the practice?
10  A     Yes.
11  Q     And with the concurrence means that with the
12  approval of the on-scene supervisor, you could dispense
13  with warnings, correct?
14  A     Basically, yes.
15  Q     Now, number ten, "Maintain verbal control and
16  frequent visual contact of the canine during the
17  search."
18       Was that the policy?
19  A     Yes.
20  Q     Was that the practice?
21  A     Yes.
22  Q     Why was that important to maintain control and
23  frequent visual contact of the dog during the search?
24  A     Just from what it says.  That way, we know where
25  our dog is and we have control of him.  But it is verbal

118

PAGE 119

1  control, meaning they can still hear our voice.
2  Frequent visual contact, meaning we don't lose sight of
3  our dog for an extended period of time.  But for officer
4  safety reasons, that's why we have the dogs.  We can't
5  see them all the time.  They are going behind trees,
6  behind bushes.  They might go around a corner where we
7  lose sight of them and that the purpose of them is to go
8  ahead of us so we are not injured.  So that's why it
9  says frequent and not constant.
10  Q     Now, reporting requirements for canine injury.
11  Do you see that?
12  A     Skipping the section to F?
13  Q     Yes.  Why don't we go to D, actually.  For
14  outside agency assistance, was this the policy at the
15  time of this incident?
16  A     Yes.
17  Q     Was this the practice, as well?
18  A     Yes.
19  Q     Okay.
20  A     And if I can just elaborate, this is primarily
21  for us going outside our agency to go, you know, into
22  the sheriff's department jurisdiction outside the city
23  to help another agency.
24  Q     Okay.  So the actual purpose of that, for
25  example, looking at reports I have seen, sometimes they

119

PAGE 120

1  may to go West Sacramento, for example, or within the
2  sheriff's?
3  A     Yes.  Maybe they don't have a canine on duty and
4  they request our assistance.  And we go outside the city
5  to assist them.
6  Q     Okay.  So that's the -- that's really what E's
7  intended for?
8  A     Yes.  We have a lot of agencies that work within
9  the City of Sacramento.  So we help parole.  We help
10  probation, and we have other agencies that come in.  So
11  we would constantly be having to go to a watch
12  commander.  So that's not what that is addressed for.
13  It's for us leaving the city.
14  Q     Okay.  And then going to F, reporting
15  requirements for canine injury.  And this policy sets
16  forth what is mandated for the officer?
17  A     For what the officer needs to do?
18  Q     Yes.
19  A     Yes.
20  Q     Okay.  So one is to complete a report, correct?
21  A     Correct.
22  Q     And that was done?
23  A     Yes.
24  Q     Obtain a statement.  Was that typically done?
25  A     Yeah, it was done.  But we also sometimes would

120

PAGE 121

1  have other officers take the statement if the canine
2  handler could not.  But we would at least attempt to
3  obtain a statement.
4  Q     Okay.
5  A     Or have it done.
6  Q     And complete an ARM 3-7790 commonly called a red
7  border form?
8  A     Yes.
9  Q     Was that the practice?
10  A     Yes.
11  Q     And then notify CSI for photos of suspect's
12  injuries.  If CSI is unavailable, notify a sector
13  sergeant for the photos.  Was that the policy?
14  A     Yes.
15  Q     Was that done?
16  A     That was done.  That -- either make sure they
17  are done or notify yourself or at least make sure
18  somebody did.
19  Q     But you typically would not look at the photos,
20  correct?
21  A     Correct.
22  Q     Okay.  And the canine officer would not
23  typically look at the photos, correct?
24  A     No.
25  Q     I think we may have a double negative.  Would

121

Garcia v. City of Sacramento   January 23, 2012   STEVE OLIVERIA, Sgt. - Vol. 1

SHEET 36   PAGE 138

**PAGE 138**

1    MS. CHAPMAN: Objection. This witness hasn't
2 identified himself as a trainer.
3 Q    (BY MR. KATZ): I'm sorry. As a handler of a
4 dog.
5 A    Priming your dog?
6 Q    Yes.
7 A    I have never used that term before.
8 Q    Well, making the dog --
9 A    Know what's going on?
10 Q    Yes.
11 A    Yes, I mean -- yeah, it's conditioning so they
12 understand they are about to go do a search.
13 Q    And do you have any reason to believe that
14 Mr. Garcia had any idea who Mr. Prasad was?
15 A    I don't think they were able to prove that, no.
16 Q    You say prove that. Do you have any reason to
17 believe that?
18 A    It's very suspicious.
19 Q    Why is that?
20 A    Because you have a person who supposedly does
21 not know this guy that sees -- he knows the police are
22 out there, sees the police cars on the street. His wife
23 tells him not to go outside because the helicopter is
24 making some type of announcement. And then he sees a
25 suspect flee, run by him, and then does not alert
                                                        138

**PAGE 139**

1 officers who are on the street that he had just walked
2 by and instead goes into the backyard with him. It's
3 very suspicious.
4    Personally, if that was my house, I would be
5 calling 911 or running to the officers immediately. So
6 it's just very suspicious actions that he took upon him.
7 Q    And did Mr. Garcia ever tell anyone that he had
8 said -- exchanged any words with Mr. Prasad?
9 A    No, not that I am aware of.
10 Q    Did anyone at 442 Potomac either residing there
11 or in the backyard indicate they had ever seen
12 Mr. Prasad before?
13 A    Not that I am aware of.
14 Q    Did Mr. Prasad ever say that he knew any of the
15 people there?
16 A    I don't think so.
17 Q    Was it your understanding that there was any
18 belief by any of the highway patrol officers who had
19 physically come in contact with Mr. Prasad that he was
20 armed?
21 A    No, you mean like during the car chase?
22 Q    Before the car chase, do you have any
23 understanding as to what happened?
24 A    I understand there was a pursuit of the suspect
25 and, no, I don't believe they had any contact with him.
                                                        139

**PAGE 140**

1 Q    Well --
2 A    After he foot balled.
3 Q    Did you have any understanding as to what
4 happened before the chase started?
5 A    No. I know they attempted to stop him and he
6 fled.
7 Q    And how many -- did you ever speak directly with
8 the observer in the helicopter?
9 A    No.
10 Q    And was it your understanding that this was
11 approximately 8:00 in the evening?
12 A    Yes.
13 Q    And this was a residential neighborhood?
14 A    Yes.
15 Q    And from your review of the video, there were a
16 number of nonofficers outside of their homes that
17 evening, weren't there? At least there were heat
18 sources shown.
19 A    Yeah, in that backyard afterwards?
20 Q    In the area.
21 A    There may have been. People, unfortunately,
22 they do congregate to see what's going on sometimes.
23 Q    That's pretty much human nature, isn't it?
24 A    Unfortunately.
25 Q    Okay. And isn't that one of the reasons why
                                                        140

**PAGE 141**

1 warnings are given?
2 A    Sure.
3 Q    Now, what does the dog do if the dog had --
4 instead of attacking Mr. Garcia, gone to the tree? What
5 would the dog do?
6 A    Bark.
7 Q    Okay. And what would -- was the purpose of the
8 dog barking in that situation?
9 A    He's alerting typically. Some of our dogs bark.
10 Some would try to get up the tree. We try to train them
11 to do a bark alert, but some dogs are better at it than
12 others.
13 Q    And so the purpose of the alert is so that the
14 officer can take the person into custody?
15 A    Well, they know where the suspect is, and they
16 can take whatever necessary actions they need to.
17 Q    Now, dogs bite people who are -- let me have
18 this marked as next in order.
19    (Whereupon the court reporter marked
20    Exhibit 37.)
21 A    Do you want me to read the whole thing?
22 Q    First of all, give you a chance to review it.
23 A    Okay. I haven't read the whole thing but --
24    MS. CHAPMAN: One advisement, Sergeant Oliveira.
25 The court has indicated that we can keep both the
                                                        141

Garcia v. City of Sacramento   January 23, 2012   STEVE OLIVERIA, Sgt. - Vol. 1

SHEET 37   PAGE 142

**PAGE 142**

1 identity of the handler/canine, suspect, victims, as you
2 seen, have been blocked out. So if you should happen to
3 independently recall that information, please don't
4 disclose it.
5 A    Okay.
6    MS. CHAPMAN: I believe, actually in hindsight,
7 the court's also ordered all of the canine apprehension
8 memos that were not related to this incident are
9 pursuant to our protective order. We will attach a copy
10 of the protective order to this deposition.
11    MR. KATZ: Doesn't identify anything. We will
12 talk about that. Nothing is identified.
13    MS. CHAPMAN: It's self-critical analysis.
14    MR. KATZ: There is no self-critical analysis.
15 A    Okay.
16 Q    (BY MR. KATZ): Okay. Do you remember having a
17 discussion with Lieutenant Bray regarding the policy?
18 A    Yeah, I have a recollection of it.
19 Q    What is your recollection as to how that
20 discussion came about?
21 A    I don't recall how he got ahold of me, but he
22 had some concerns with the deployment being on a traffic
23 violation. And then we just had a, basically, a
24 felony-evading charge. So I told him that I would do
25 some research. I didn't have an issue with it. I felt
142

**PAGE 143**

1 it was within policy.
2    And so I went ahead and did some research and
3 contacted Bruce Praet, who is an attorney I had taken
4 some legal update classes from to get his opinion. And
5 I let him know what his opinion was, which was what I
6 wrote in the report.
7 Q    And was Lieutenant Bray the first person to
8 raise the question with you as to whether it was in the
9 policy of the department to have dogs deployed when
10 there is a foot ball following a vehicle chase?
11 A    Yes, probably. As far as I can remember.
12 Q    Is he the last person to raise that question?
13 A    Possibly. I probably had people ask me, you
14 know, either training or have sergeants come to me on a
15 personal basis what my thoughts were on it. But nothing
16 formal like this one. But I am actually holding a
17 supervisors CPT class. We are going to cover issues
18 like this.
19 Q    I'm sorry. What does that stand for?
20 A    Like annual training.
21 Q    Okay. Just want to take a short break, because
22 I have to get a bunch of copies.
23    MS. CHAPMAN: Okay.
24    (Recess taken.)
25 Q    (BY MR. KATZ): Sergeant Dahl, you indicated
143

**PAGE 144**

1 that there was a belief that dogs were being
2 underutilized by the Sacramento Police Department.
3 A    I wouldn't put it like that. I would say the
4 officers weren't using their best officer safety in
5 utilizing their the resources, and also, they weren't
6 doing as good a job of setting up perimeters as we would
7 have liked.
8 Q    Did anyone ever look and see if there were more
9 casualties due to police action after the dogs were used
10 more liberally?
11 A    You mean as in accidental bites or suspects
12 being bitten?
13 Q    Anyone. People.
14    MS. CHAPMAN: I'm going to object on the grounds
15 the question is vague and ambiguous. But if you
16 understand it, go ahead.
17 A    No, I didn't do any kind of review on that.
18 Q    (BY MR. KATZ): Okay. Was there any documented
19 decrease in patrol officer casualties?
20 A    No, I have never done any kind of research for
21 that, no. But I can say that any time a canine has been
22 utilized in the five years, that I have never had an
23 officer that was injured.
24 Q    You have had canines bitten officers, haven't
25 you?
144

**PAGE 145**

1 A    They have. I am -- let me clarify my answer
2 then. I have not had any other officers that were
3 injured by the suspects when a canine was utilized to
4 apprehend that suspect. I can't recall an incident.
5 Q    Mark this next in order.
6    (Whereupon the court reporter marked
7    Exhibit 38.)
8 Q    (BY MR. KATZ): Do you have a recollection, at
9 all, of this incident?
10 A    Yes. I can't recall all the details, but it did
11 refresh my memory.
12 Q    Okay. And you talked about the type of offense
13 when you wouldn't expect to see a dog used?
14 A    Yes.
15 Q    Well, in this case was the underlying conduct a
16 potential city code violation?
17 A    The initial contact, yes.
18 Q    Well, and the person ran away from that contact?
19 A    Correct.
20 Q    And this is -- you found the use of the dog in
21 this circumstance was in policy?
22 A    It's because of what occurred afterward.
23 Q    But what occurred afterwards was after the dog
24 already contacted the people, right?
25 A    No.
145